# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TERA GROUP, INC., TERA ADVANCED TECHNOLOGIES, LLC, and TERAEXCHANGE, LLC, <br><br> Plaintiffs, <br><br> -against- <br><br> CITIGROUP, INC., CITIBANK  N.A., CITIGROUP GLOBAL MARKETS INC., CITIGROUP GLOBAL MARKETS LIMITED,  BARCLAYS PLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., BNP PARIBAS, S.A., BNP PARIBAS SECURITIES CORP., CREDIT SUISSE AG, CREDIT SUISSE GROUP AG, CREDIT SUISSE SECURITIES (USA) LLC, CREDIT SUISSE INTERNATIONAL, JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, J.P. MORGAN SECURITIES PLC, RBS SECURITIES INC., and UBS SECURITIES LLC, <br><br> Defendants. | Docket No. 1:17-cv-4302 <br><br> Hon. Richard J. Sullivan <br><br> **AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

JURISDICTION AND VENUE ........................................................................................ 6

PARTIES .......................................................................................................................... 8

    A.  Plaintiffs .............................................................................................................. 8

    B.  The Citi Defendants ........................................................................................... 8

    C.  The Barclays Defendants .................................................................................... 9

    D.  The BNP Paribas Defendants ............................................................................ 10

    E.  The Credit Suisse Defendants ........................................................................... 11

    F.  The JPMorgan Defendants ................................................................................ 12

    G.  The UBS Defendants ......................................................................................... 13

FACTS ............................................................................................................................. 14

    I.    TERAEXCHANGE DEVELOPS A PLATFORM FOR ELECTRONIC ALL-TO-ALL, CENTRAL LIMIT ORDER BOOK CDS TRADING ................................................. 14

    A.  The Dodd-Frank Act required CDS trading take place on an exchange. ....................... 14

    B.  Tera develops the first all-to-all CLOB platform for CDS trading. ............................... 17

    C.  TeraExchange successfully signed up customers to use the platform. ......................... 20

    D.  TeraExchange had commitments from inter-dealer brokers to use its platform. ........... 22

    E.  Anonymous all-to-all swap trading begins on TeraExchange. ..................................... 23

    II.  DEFENDANTS CONSPIRED TO COLLECTIVELY BOYCOTT TERAEXCHANGE . 23

    A.  The Dealer Defendants refused to trade on TeraExchange ........................................... 25

    B.  The Dealer Defendants used their control over CDS clearing to prevent CDS trades from occurring on TeraExchange .......................................................................... 26

    C.  The Dealer Defendants prohibited inter-dealer brokers from using TeraExchange. ..... 31

    D.  The Dealer Defendants insisted on "name give-up" to deter buy-side participation on TeraExchange and other all-to-all SEFs ......................................................... 34

    E.  The Dealer Defendants placed transgressors in the "penalty box" ............................... 39

    F.  TeraExchange has been shut out of the CDS market as a direct result of the Dealer Defendants' conspiracy. ....................................................................................... 42

TOLLING AND FRAUDULENT CONCEALMENT ..................................................... 43

CLAIMS FOR RELIEF ................................................................................................... 44

FIRST CLAIM FOR RELIEF ......................................................................................... 44

SECOND CLAIM FOR RELIEF .................................................................................... 45

i

PRAYER FOR RELIEF ........................................................................................................... 48

JURY DEMAND ................................................................................................................... 49

Plaintiffs Tera Group, Inc., Tera Advanced Technologies, LLC, and TeraExchange, LLC (together, "Tera," "TeraExchange" or "Plaintiffs"), bring this action against Defendants,[1] and upon knowledge, information, belief, and investigation of counsel, allege as follows:

## INTRODUCTION

1.      This case involves a conspiracy among the largest credit default swap ("CDS")[2] dealers in the United States (the "Dealer Defendants" as defined in ¶¶ 27 – 42, below) to block Plaintiffs' electronic CDS trading platform, TeraExchange, from successfully entering the market.

2.      A CDS is one of the most widely-traded types of financial instruments. At the end of 2014, there were $9.4 trillion in "notional" value of CDS contracts outstanding in the United States. Each CDS functions like a tradable insurance contract and derives its value from the risk associated with a specified "credit event," such as the chance that a certain company will default on a payment or have its credit rating downgraded.

---

[1] This Amended Complaint removes Plaintiffs' causes of action for unjust enrichment and tortious interference with business relations, as well as Plaintiffs' allegations concerning certain Defendants all of which were previously dismissed by the Court. *See Tera Grp., Inc. v. Citigroup, Inc.*, No. 17-cv-4302 (RJS), 2019 WL 3457242, at *23 (S.D.N.Y. July 30, 2019); *Tera Grp., Inc. v. Citigroup, Inc.*, No. 17-cv-4302 (RJS), 2018 WL 4732426, at *3 (S.D.N.Y. Sept. 28, 2018). These "Dismissed Defendants" include: HSBC Holdings plc, HSBC Bank plc, HSBC Bank USA, N.A., and HSBC Securities (USA) Inc. ("HSBC"); Deutsche Bank AG and Deutsche Bank Securities Inc. ("Deutsche Bank"); Goldman Sachs Group, Goldman Sachs & Co., Goldman Sachs Bank USA, Goldman Sachs Financial Markets, L.P., and Goldman Sachs International ("Goldman Sachs"); Morgan Stanley, Morgan Stanley Bank, N.A., Morgan Stanley & Co., Morgan Stanley Capital Services LLC, Morgan Stanley Derivative Products Inc., and Morgan Stanley Bank International Limited ("Morgan Stanley"); Bank of America Corporation, Bank of America N.A., and Merrill Lynch ("Bank of America"); UBS AG; and Royal Bank of Scotland plc, and Royal Bank of Scotland Group plc ("RBS"). The omissions of these claims and defendants are not intended as a waiver of these claims and allegations. Plaintiffs intend to preserve their right to appeal the dismissals of these Defendants and causes of action. *See Hancock v. Cty. of Rensselaer*, 882 F.3d 58, 63 (2d Cir. 2018) (plaintiffs need not futilely replead dismissed claims in order to preserve them for appeal).

[2] "CDS" refers to either the singular, "credit default swap," or the plural, "credit default swaps."

3.      The Dealers[3] collectively control approximately 95% of the CDS market. Two of the Dealer Defendants —J.P. Morgan and Citigroup—comprise more than 25% of all CDS dealing in the U.S.[4]

4.      Dealer Defendants profit from creating and selling CDS contracts to the "buy side," *e.g.*, mutual funds, hedge funds, insurance companies, or other investors. The Dealer Defendants generate fees from each CDS they sell to the buy-side. Because of the high volume and large size of CDS transactions, trading CDS proved to be extremely lucrative for the Dealer Defendants.

5.      The Dealers were able to dictate the structure of the CDS market because they were the exclusive market-makers for CDS. They chose a "two-tiered" trading structure, which benefited the Dealers while systematically disadvantaging their customers. For example, the Dealers have always traded CDS with each other on anonymous inter-dealer platforms, where they have exclusive access to the price at which CDS is trading. At the same time, the Dealers required that buy-side customers trade CDS with them exclusively pursuant to an opaque and inefficient over-the-counter, "Request for Quote" (or "RFQ") system.

6.      The RFQ protocol was designed to keep the buy-side at a competitive disadvantage, preventing information about CDS pricing from reaching the public. For example, customers who wanted to purchase CDS had to contact a Dealer directly, identify themselves, and specify the terms of the CDS they wanted to purchase, before receiving a price quote from that Dealer. This procedure was slow and inefficient. It also stymied competition by giving the Dealers control over CDS prices and thus the ability to generate even larger profits by taking advantage of the buy-side, who did not have equivalent price information. The Dealer

---

[3] "Dealers" refers to the Dealer Defendants plus the Dismissed Defendants.
[4] *2014 Greenwich Leaders: U.S. Fixed Income*, GREENWICH ASSOCIATES (July 22, 2014), https://www.greenwich.com/fixed-income-fx-cmds/2014-greenwich-leaders-us-fixed-income.

Defendants took advantage of this informational asymmetry and quoted grossly inflated "bid/ask spreads" on CDS—the difference between the "bid" price, at which a Dealer Defendant will purchase the CDS, and the "ask" price, at which it will sell the CDS—to buy-side customers.

7.      The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act" or "Dodd-Frank") sought "to promote pre-trade price transparency in the swaps market"[5] and put an end to the RFQ-only model by mandating that CDS and other derivatives be traded on a regulated electronic exchange called a Swap Execution Facility ("SEF"). The SEF trading model had the potential to transform the CDS market and increase competition, allowing market participants to enter swap transactions in the same way they would trade common stock:  by accepting bids and offers made by multiple market participants.

8.      TeraExchange was founded by a group of experienced former Wall Street traders who sought to capitalize on Dodd-Frank's reforms. Tera spent millions of dollars and several years developing a CDS trading platform that used a central limit order book ("CLOB") allowing for electronic trading among all market participants ("all-to-all" trading). This is the same transparent system employed by the securities markets to anonymously match customer orders. TeraExchange was the first SEF to offer an anonymous all-to-all CLOB to the CDS market.

9.      Tera developed an aggressive marketing plan that sought liquidity from both the Dealers and "non-traditional" providers like inter-dealer brokers and hedge funds. The market response was overwhelming. According to an April 2014 survey by IPC Systems Inc., 50% of market participants reported that they had already connected or planned to connect to TeraExchange. Numerous inter-dealer brokers, including R.P. Martin and OTCex, banks such as Mitsubishi UFJ Financial Group and Mizuho Bank, Ltd., and large buy-side CDS trading firms

---

[5] Section 5h(e) of the Commodity Exchange Act, 7 U.S.C. 7b-3(e).

like Saba Capital and Lucidus Capital signed up to use TeraExchange. These entities recognized the benefits of trading CDS on an all-to-all anonymous SEF and were eager to use this new platform.

10.     TeraExchange built its CDS platform with features tailored to the trading needs of CDS customers. TeraExchange offered sophisticated charting capabilities which enabled customers to view, track prices on, and trade the two different types of CDS—single-name versus CDS indices (discussed *infra* ¶¶ 64-66)—at the same time. This enabled traders to take advantage of arbitrage opportunities between the two products. TeraExchange was also the only anonymous all-to-all CLOB licensed to list CDS indices. TeraExchange's platform thus offered a unique value proposition for CDS market participants and TeraExchange was positioned for success. Tera continued to develop new features and sign up customers eager for all-to-all CLOB trading to finally reach the CDS market.

11.     Everything changed on June 13, 2014. That morning, Annaly Capital Management, Inc. and Mitsubishi UFJ Financial Group successfully executed the world's first ever anonymous swap transaction on an all-to-all CLOB platform using TeraExchange.

12.     This trade was a threat to the Dealer Defendants' supracompetitive profits from the CDS market. As Reuters reported, "[t]rading swaps on new electronic venues has been one of the most contested reforms of the . . . derivatives markets in the United States as these contracts form a large part of bank profits. A study by consultancy McKinsey in June [2014] estimated *banks could lose up to $4.5 billion in revenues annually* because of electronic trading."[6] Morgan Stanley acknowledged that all-to-all "trading platforms [were] well placed to gain market share

---

[6] Karen Brettell, *Banks' pressure stalls opening of U.S. derivatives trading platform*, REUTERS (Aug. 27, 2014), available at http://www.reuters.com/article/us-usa-derivatives-banks-idUSKBN0GR1Z320140827 (emphasis added). Defendant JPMorgan admitted that the new SEF rules would "cost it [alone] $1 billion to $2 billion in revenue a year." *See* Leising, *infra* n. 18.

from the dealers," and projected that SEF platforms would generate $5-6 billion dollars in execution revenues annually by 2013.[7] TeraExchange was poised to take business from the big banks that dominated CDS trading if its SEF was allowed to enter the market.

13.     The Dealer Defendants began working together to shut down TeraExchange after the first trade, in furtherance of their ongoing boycott.

14.     The Dealer Defendants also conspired to implement a group boycott through several other means, including: (1) refusing to direct any CDS transactions to TeraExchange and (2) refusing to clear and settle any CDS trades that customers wanted to executed on Tera's all-to-all CLOB platform.

15.     Lastly, the Dealer Defendants used their dominant positions of control in the CDS market to steer CDS transactions to SEFs that required trading to follow the old RFQ-only policy. For example, Dealer Defendants forced buy-side customers away from TeraExchange by quoting exorbitant fees to clear trades on its all-to-all CLOB platform while offering to execute the same transactions for much less or for free on Tradeweb—a SEF created and owned by the Dealer Defendants—or Bloomberg, which did not object to their RFQ requirement.

16.     This is not the first time the Dealers have been accused of conspiring to block an independent electronic CDS platform to maintain their supracompetitive profits on CDS trading. The U.S. Department of Justice and the European Commission both launched investigations into the Dealers' conduct in the CDS market in 2011. In September 2015, the Dealers paid $1.86 billion to settle a class action brought by investors accusing them of fixing prices on CDS transactions and blocking the launch of the Credit Market Derivatives Exchange ("CMDX"), an electronic exchange and clearinghouse for CDS developed by Citadel LLC and the CME Group

---

[7] *See* Morgan Stanley & Oliver Wyman, *The Future of Capital Markets Infrastructure* (2011) at 4, 20.

Inc. The Dealer Defendants are also currently under investigation by the CFTC for similar misconduct in the interest rate swaps market. Defendant Citigroup recently revealed that they are a target of the CFTC's "*industrywide*" probe into "the trading and clearing of interest rate swaps by investment banks."[8]

17.     As a direct result of Defendants' conspiracy to boycott TeraExchange's anonymous all-to-all CLOB for CDS, Plaintiffs have been injured and financially damaged in their respective business and property, including by having lost capital, market share, profits, and goodwill. Plaintiffs anticipate that additional evidence supporting their claims as alleged herein will be uncovered after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a). This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

19.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries to Plaintiffs alleged herein, arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

20.     Venue is proper in this District under 15 U.S.C. §§ 15(a) and 22, as well as 28 U.S.C. § 1391(b), (c), and (d), because Tera resided, transacted business, were found, or had agents in this District; all of the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims

---

[8] Christina Rexrode, *Citigroup says CFTC Investigating Banks' Interest-Rate Swaps*, WALL STREET JOURNAL (Oct. 31, 2016), https://www.wsj.com/articles/citigroup-says-cftc-investigating-banks-interest-rate-swaps-1477921515.

occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

21.     Defendants, directly and indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate and/or international commerce in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

22.     Pursuant to the nationwide contacts test provided for by 15 U.S.C. § 22, all Defendants are subject to personal jurisdiction in the United States because they, as set forth below, were formed in or have their principal places of business in the United States. All Defendants transact business in this District. In addition, all members of the conspiracy are subject to personal jurisdiction in the United States because the conspiracy was directed at, carried out in substantial part in, and had the intended effect of, causing injury to Plaintiffs, who resided in and did business in the United States.

23.     The Dealer Defendants are also subject to personal jurisdiction here because they each transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action. The CDS at issue in this action often included a contractual clause submitting the parties to jurisdiction in this District. Also, the CDS at issue were regularly traded through the desks of the Dealer Defendants located in New York. The Dealer Defendants are also subject to personal jurisdiction here because their affiliates and subsidiaries traded CDS in the United States as their agents.

# PARTIES

## A. Plaintiffs

24.     Plaintiff Tera Group, Inc. ("Tera Group") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Summit, New Jersey.

25.     Plaintiff TeraExchange, LLC ("TeraExchange LLC") is a Delaware limited liability company with its principal place of business located in New York, New York. TeraExchange LLC conducts swap execution activities, and has been granted registration as a SEF by the CFTC. TeraExchange LLC is a wholly-owned subsidiary of Tera Group.

26.     Plaintiff Tera Advanced Technologies LLC ("Tera Advanced") is a Delaware limited liability company with its principal place of business in Summit, New Jersey. Tera Advanced creates and provides to TeraExchange technology utilized to operate the SEF. Tera Advanced is a wholly-owned subsidiary of Tera Group. Collectively, Tera Group, TeraExchange LLC, and Tera Advanced Technologies are referred to as "Tera" or "TeraExchange."

## B. The Citi Defendants

27.     Defendant Citigroup, Inc. ("Citigroup") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 399 Park Avenue, New York, New York 10043. Defendant Citibank N.A. ("Citibank") is a federally chartered national banking association incorporated in South Dakota, with its principal place of business located at 399 Park Avenue, New York, New York 10043. Citibank is a wholly-owned subsidiary of Citigroup. Citibank is a provisionally registered swap dealer with the CFTC and is a clearing firm on the Intercontinental Exchange ("ICE") and the Chicago Mercantile Exchange ("CME"). Defendant Citigroup Global Markets Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 153 East

8

53rd Street, New York, New York 10022. Citigroup Global Markets Inc. is a subsidiary of

Citigroup. Citigroup Global Markets Inc. is provisionally registered as a swap dealer and a

Futures Commission Merchant ("FCM") with the CFTC, and as a broker-dealer with the U.S.

Securities and Exchange Commission ("SEC"). Defendant Citigroup Global Markets Limited is

a corporation organized and existing under the laws of England, with its principle place of

business in London. Citigroup Global Markets Limited is a provisionally registered swap dealer

with the CFTC and is a clearing firm on ICE and the CME.

28.     As used herein, the term "Citi" includes Defendants Citigroup, Citibank,

Citigroup Global Markets Inc., Citigroup Global Markets Limited, and their subsidiaries and

affiliates that participated in the CDS market.

### C.  **The Barclays Defendants**

29.     Defendant Barclays PLC is a global financial services provider headquartered and

incorporated in England.  Two of Barclays PLC's U.S. "material entities" include Barclays Bank

PLC New York Branch and Barclays Capital Inc.[9]  Barclays PLC owns all of the issued ordinary

share capital of Defendant Barclays Bank PLC.[10]

30.     Defendant Barclays Bank PLC, a wholly-owned subsidiary of Defendant Barclays

PLC, is headquartered and incorporated in England.  Barclays Bank applied for and received a

banking license with the New York State Department of Financial Services ("NYSDFS") and

used that license to open a branch in New York located at 745 Seventh Avenue, New York, New

York 10019. This branch was not a separate legal entity, but a direct extension of Barclays Bank

into the U.S. market that operated during U.S. business hours pursuant to its NYSDFS licenses

---

[9] Resolution Plan, Section 1: US Public Section, BARCLAYS, at 2 (July 2012).

[10] Form 20-F, Barclays PLC, Barclays Bank PLC (2005).

as any other domestic bank. In exchange for the right and privilege of conducting banking business in the State of New York, Barclays Bank consented to jurisdiction in the United States, appointing the Superintendent of Financial Services of New York as their agent for service of process. Barclays Bank's New York branch has over 500 employees and over $36 billion in total assets. Barclays Bank is a provisionally registered swap dealer with the CFTC and is a clearing firm on ICE.

31.     Defendant Barclays Capital Inc. ("BCI") is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business located at 745 Seventh Avenue, New York, New York 10019. BCI is a wholly-owned subsidiary of Barclays Group U.S. Inc., which in turn is a wholly-owned subsidiary of Barclays Bank. BCI is registered as a broker-dealer with the SEC, and as a FCM with the CFTC. BCI is a clearing firm on ICE, the CME, the Chicago Board of Trade ("CBOT"), the New York Mercantile Exchange ("NYMEX"), and the Commodity Exchange, Inc. ("COMEX").

32.     As used herein, the term "Barclays" includes Defendants Barclays PLC, Barclays Bank, BCI, and their subsidiaries and affiliates that participated in the CDS market.

**D.  The BNP Paribas Defendants**

33.     Defendant BNP Paribas, S.A. ("BNPP") is a corporation organized and existing under the laws of France, with its principal place of business in Paris, France. BNP Paribas applied for and received a banking license with the NYSDFS and used that license to open a branch in New York located at 787 7th Avenue, New York, New York 10019. This branch was not a separate legal entity, but a direct extension of BNP Paribas into the U.S. market that operated during U.S. business hours pursuant to its NYSDFS license as any other domestic bank. In exchange for the right and privilege of conducting banking business in the State of New York,

BNP Paribas consented to jurisdiction in the United States, appointing the Superintendent of Financial Services of New York as their agent for service of process. BNP Paribas engages in CDS transactions from its New York branch. BNPP is a provisionally registered swap dealer with the CFTC and is a clearing firm on the CME and ICE.

34.     BNP Paribas Securities Corp. ("BNPP Securities") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York. BNPP Securities is a wholly-owned subsidiary of BNP Paribas North America, Inc., the ultimate parent of which is BNPP. BNPP has designated BNPP Securities as a "material entity" within the U.S. BNPP Securities is registered as a broker-dealer with the SEC, and as a FCM with the CFTC. BNPP Securities is a clearing firm on ICE and the CME.

35.     As used herein, the term "BNP Paribas" includes Defendants BNPP, BNPP Securities, and their subsidiaries and affiliates that participated in the CDS market.

### E.  The Credit Suisse Defendants

36.     Defendant Credit Suisse Group AG is a corporation organized and existing under the laws of Switzerland, with its principal place of business in Zurich, Switzerland. Defendant Credit Suisse AG is a bank organized and existing under the laws of Switzerland, with its principal place of business in Zurich, Switzerland. Credit Suisse AG applied for and received a banking license with the NYSDFS and used that license to open a branch in New York located at 11 Madison Avenue, New York, New York 10010. This branch was not a separate legal entity, but a direct extension of Credit Suisse AG into the U.S. market that operated during U.S. business hours pursuant to its NYSDFS licenses as any other domestic bank. In exchange for the right and privilege of conducting banking business in the State of New York, Credit Suisse AG consented to jurisdiction in the United States, appointing the Superintendent of Financial Services of New York as their agent for service of process. Credit Suisse AG identifies its Credit

Products division as a core business line in the United States and acts as a "market maker in the credit derivatives market."

37.     Defendant Credit Suisse Securities (USA) LLC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 11 Madison Avenue, New York, New York 10010. Credit Suisse Securities (USA) LLC is a wholly-owned subsidiary of Credit Suisse (USA), Inc., whose ultimate parent is Credit Suisse Group AG. Credit Suisse Securities (USA) LLC is registered as a broker-dealer with the SEC, and as a FCM with the CFTC. Credit Suisse Securities (USA) LLC is a clearing firm on ICE and the CME. Defendant Credit Suisse International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England. Credit Suisse International is registered as a swap dealer with the CFTC, and is a clearing firm on ICE and CME.

38.     As used herein, the term "Credit Suisse" includes Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, and their subsidiaries and affiliates that participated in the CDS market.

**F.   The JPMorgan Defendants**

39.     Defendant JPMorgan Chase & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 270 Park Avenue, New York, New York. Defendant JPMorgan Chase Bank, N.A. is a federally-chartered national banking association with its principal place of business located at 270 Park Avenue, New York, New York. JPMorgan Chase Bank, N.A. is provisionally registered as a swap dealer with the CFTC and is a clearing firm on the ICE. Defendant J.P. Morgan Securities LLC (also known as "J.P. Morgan Securities Inc.") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York. J.P. Morgan Securities

LLC is a wholly-owned subsidiary of J.P. Morgan Securities Holdings LLC, which in turn is a subsidiary of JPMorgan Chase & Co. J.P. Morgan Securities LLC is registered as a broker-dealer with the SEC, and as a FCM and a provisionally registered swap dealer with the CFTC. J.P. Morgan Securities LLC is a clearing firm on the CME and ICE. Defendant J.P. Morgan Securities plc (formerly known as "J.P. Morgan Securities Ltd.") is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England, and it is a wholly-owned subsidiary of JPMorgan Chase & Co. J.P. Morgan Securities plc is provisionally registered as a swap dealer with the CFTC.

40.     As used herein, the term "JPMorgan" includes Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, J.P. Morgan Securities plc, and their subsidiaries and affiliates that participated in the CDS market.

### G. **The UBS Defendants**

41.     UBS AG is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland. UBS AG maintains a branch in this District located at 1285 Avenue of the Americas, New York, New York 10019, and branches in Stamford, Connecticut and Miami, Florida. UBS AG's New York branch is licensed, supervised, and regulated by the Office of the Comptroller of the Currency to do business in New York. UBS's U.S. branches are branches of UBS AG and not separate legal entities. Pursuant to FRB regulations, Connecticut is UBS's home state. UBS AG is provisionally registered as a swap dealer with the CFTC.  UBS filed a Resolution Plan with the Federal Reserve in 2014 in which it acknowledged that it is a global institution with the majority of its operations located in Switzerland, the United Kingdom and the United States.  In its Resolution Plan, UBS designated its New York and Stamford, Connecticut branches as material entities. UBS' shares are registered as Global Registered Shares on the NYSE.

13

42.     Defendant UBS Securities LLC is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York, and is an indirect wholly-owned subsidiary of UBS AG. UBS Securities LLC is registered as a broker-dealer with the SEC, and as a FCM with the CFTC. UBS Securities LLC is a clearing firm on the CME and ICE.

## FACTS

### I.   TERAEXCHANGE DEVELOPS A PLATFORM FOR ELECTRONIC ALL-TO-ALL, CENTRAL LIMIT ORDER BOOK CDS TRADING

### A.   The Dodd-Frank Act required CDS trading take place on an exchange.

43.     On July 21, 2010, Congress passed the Dodd-Frank Act, the most extensive overhaul of the U.S. financial system since the 1930s. This law addressed several problems that contributed to the 2008 financial crisis and enacted reforms directed at increasing transparency and lowering the cost of swap transactions in the over-the-counter derivatives market. For example:

44.     The Dodd-Frank Act required that all swap transactions take place on a Swap Execution Facility ("SEF"), *i.e.*, "a trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants . . . ."[11] SEFs are regulated by the CFTC like other public exchanges, introducing a layer of oversight into a previously-unregulated market. The new system would also promote pre-trade price transparency in the swaps market by allowing customers to pick and choose which swaps they wanted to buy or sell based on available competitive bids and offers *before* entering a transaction.[12] This was a major improvement over the old voice-brokered, RFQ model

---

[11] 17 C.F.R. § 1.3(rrrr).

[12] Section 5h(e) of the Commodity Exchange Act, 7 U.S.C. 7b-3(e).

of derivatives trading, which required buy-side customers to contact individual dealers directly, thus limiting the amount of pre-trade pricing information available.

45.     There are two kinds of CDS: single-name CDS and index CDS. Single-name CDS are based on a single debt instrument issued by one underlying reference entity, typically a corporation or a government entity. An index CDS is a credit derivative that references a basket of underlying single-name reference-entities. It is used to hedge macro credit risk rather than take a position on a particular entity's credit profile. There are currently two main sub-types of CDS indices: (1) CDX, which is comprised of 125 North American entities (*i.e.* corporations) with investment grade credit ratings that trade in the CDS market, and (2) iTraxx, which consists of liquid European and Asian reference entities.[13]

46.     Under Dodd-Frank, regulation of the CDS market is divided between the CFTC and the SEC. The CFTC has authority over CDS indices while the SEC regulates single-name CDS. The CFTC's SEF execution mandate went into effect for CDS indices on February 26, 2014. CDS indices make up an overwhelming percentage of the market, constituting 76% of total CDS transaction volume in the first half of 2014.

47.     The SEC has yet to mandate SEF execution and central clearing for single-names. Since 2013, however, huge volumes of single-name CDS have been executed on SEFs and centrally cleared through clearinghouses. ICE Clear Credit, LLC ("ICE Clear") started clearing single-name CDS in June 2013. As of April 10, 2015, single name CDS represented 40% of the $1.55 trillion dollars in open interest of CDS, and at least 15% of the daily credit clearing activity at clearinghouses.[14] Over $100 billion in notional amount of single-name CDS was

---

[13] Markit Group Limited ("Markit") owns both the CDX and iTraxx indices and sets the contract terms, such as maturity, for both. Markit was owned by the Dealers until June 18, 2014.

[14] *See* Todd Skarecky, *CDS Clearing Data*, CLARUS FINANCIAL TECHNOLOGY (Apr. 14, 2015), https://www.clarusft.com/cds-clearing-data/.

cleared by ICE Clear in the first seven months of 2016, compared with $33.3 billion for the full

2015 year, an increase of 200%.[15] This explosive growth in single-name CDS clearing, much of

which is executed on SEFs, "occurred in the absence of a regulatory single name CDS clearing

mandate" from the SEC.[16]

48.     Dodd-Frank also created "post-trade" price transparency by requiring that swap

market participants promptly report the details of their transactions to a Swap Data Repository

("SDR"), *i.e.*, a centralized recordkeeping entity that would maintain historical pricing data for

swap transactions. Using the SDR's database, market participants could compare the price they

paid in a certain swap transaction to what others paid for the same or similar swaps. Prior to

Dodd-Frank, this kind of information was unavailable because data regarding over-the-counter

swap transactions prices were kept private. This made it easy for the Dealer Defendants, who had

an informational advantage based on the large volume of trades they entered with various

counterparties, to charge their customers higher prices.

49.     In addition to promoting pre- and post-trade price transparency, the Dodd-Frank

Act also required that a swap's value be reported continuously for the duration of the trade. This

provided counterparties easy access to information regarding the value of their swap positions

and allowed regulators to effectively monitor the swaps markets for manipulative behavior.

50.     The Dodd-Frank Act also sought to reduce the counterparty risk associated with

over-the-counter derivatives trading by requiring that swap transactions be cleared through a

central "Derivatives Clearing Organization" ("DCO"). The CFTC's rules on mandatory central

clearing for CDS indices went into effect in March 2013. Under a central clearing model, the

---

[15] Intercontinental Exchange, Press Release, ICE Clear Credit Surpasses $100 Billion in Client Cleared Single Name
Credit Default Swaps for 2016 (Aug. 11, 2016),
http://www.businesswire.com/news/home/20160811005980/en/ICE-Clear-Credit-Surpasses-100-Billion-Client.
[16] *Id.*

DCO or clearinghouse becomes a counterparty to both sides of each trade, acting as an intermediary between the two swap participants and guarantying performance on that contract. This represented a major structural change from how the CDS market previously functioned. Before Dodd-Frank, counterparties faced each other directly in swap transactions, meaning they assumed the full risk of loss if their counterparty defaulted. This was a significant risk for CDS transactions given their high notional value and long maturities.

**B.   Tera develops the first all-to-all CLOB platform for CDS trading.**

51.     Recognizing the opportunity presented by these regulatory changes, an experienced group of Wall Street traders founded TeraExchange to build an electronic trading platform for CDS that met Dodd-Frank's requirements.

52.     Developing the platform required enormous amounts of capital, technological skill, and industry knowledge. Tera raised millions of dollars from outside investors who believed that TeraExchange would be commercially successful and disrupt the RFQ-only model of CDS trading. After securing this funding, Tera moved forward aggressively in developing and marketing TeraExchange, the first anonymous, all-to-all CLOB SEF for CDS. TeraExchange offered numerous features in high demand in the CDS market in order to attract buy-side customers.

53.     For example, TeraExchange was built as an all-to-all CLOB that anonymously matched customers' bids and offers. This method of trading offered reduced transaction costs and improved pricing on CDS.

54.     TeraExchange developed sophisticated back-end technologies for its electronic trading platform, including connectivity with clearinghouses, SDRs, and other intermediaries. Tera spent millions of dollars and allocated substantial time and resources to developing this

technological infrastructure, hiring many technology and operations experts to build and manage it.

55.     Plaintiffs built a front-end execution management system for traders with sophisticated order management capabilities, along with advanced analytics and charting, full-market depth, and executable real-time pricing. This included technology to allow all market participants to easily use its trading platform. TeraExchange provides users with flexibility and choice in accessing TeraExchange's platform, including remote access, local installation, access through established trading networks, and an application program interface ("API") to allow access from in-house applications. TeraExchange also allows traders to engage in other CDS trading protocols if needed, including RFQ, request for market ("RFM"), and indication of interest ("IOI"), although TeraExchange's CLOB was its primary platform.

56.     TeraExchange also developed a proprietary embedded pre-trade credit confirmation tool, TeraCheck, which enabled market participants to pre-screen orders prior to execution, thereby reducing or eliminating trade breakage (*i.e.* a failure in completing the trade) and providing greater clearing certainty. By confirming *in real time* that each trade's executing parties had the available credit to enter into the trade, TeraCheck enabled every order on TeraExchange to be a firm offer, not just an indication of interest, as was the case with historical over-the-counter RFQ trading. TeraCheck was market-leading technology and a unique differentiator for the platform. In addition to TeraCheck, TeraExchange also built connectivity for its customers to industry standard credit hubs, such as Traiana, for pre-trade risk control. This afforded choice and flexibility to TeraExchange's clients and their FCM clearing members, who could choose between using Traiana or TeraCheck for their pre-trade risk mitigation needs. Many of the Dealer Defendants's FCMs used Traiana. TeraExchange announced in January 2014

that it had established a certified, live connection to Traiana, enabling clients (and their FCMs) who used it to manage real-time trading and clearing limits before entering a trade.

57.     TeraExchange's CDS platform was built with technological features that accommodated the specific needs of buy-side CDS traders. For example, CDS traders can make money on the 'skew,' or difference between the price of a CDS index and its underlying constituent single-name entities. TeraExchange offered CDS traders sophisticated charting capabilities which enabled them to view, track prices on, and trade both single-name CDS and CDS indices at the same time, enabling customers to take advantage of arbitrage opportunities between the two products. TeraExchange was also the only anonymous all-to-all CLOB SEF that was licensed by Markit to list the CDX and iTraxx indices. TeraExchange listed the complete range of CDX and iTraxx indices and offered all of the underlying single-name CDS, among others, on its platform.  TeraExchange's CDS platform thus offered a unique value proposition for CDS market participants.

58.     Tera incurred substantial related expenses in order to build and launch TeraExchange, including renting office space, data center fees, licenses to use software and financial vendor platforms, and legal and compliance services, as well as the National Futures Association's monthly fees for oversight and other self-regulatory organization services.

59.     After the CFTC finalized its rules for SEF registration, TeraExchange devoted substantial resources to make its platform compliant. TeraExchange submitted the necessary materials for SEF registration on July 26, 2013 and received a temporary SEF certification on September 9, 2013. As part of TeraExchange's SEF certification, the CFTC reviewed and commented on TeraExchange's Rulebook, a document that sets out protocols for how trades are

initiated, routed, and executed on the platform. The CFTC required that all SEFs have a rulebook.

**C.  TeraExchange successfully signed up customers to use the platform.**

60.    TeraExchange's features and benefits generated real interest and accolades from the financial community. 50% of market participants reported in an April 2014 survey by IPC Systems Inc. that they had already signed up or planned to use TeraExchange, second only to the CME's SEF with 53%. *The Wall Street Letter*, a respected source of information on trading technology, nominated TeraExchange for three of its 2013 Institutional Trading Awards, including a "highly commended" designation for best derivatives trading platform.

61.    Prior to its launch, Tera had lined up sizeable, sincere commitments from numerous U.S. hedge funds and other buy-side entities, inter-dealer brokers, and large dealer banks to use TeraExchange. These included, among others, Lucidus Capital and Saba Capital (two of the largest CDS buy-side firms in the world), Annaly Capital Management, Inc. ("Annaly Capital"), Susquehanna International Group, LLP ("Susquehanna"), Mizuho Bank, Ltd., DRW Holdings, LLC, Virtu Financial, and AQR Capital Management. Many of these prospective clients, including Saba Capital, had signed End User License Agreements ("EULAs") and were in "simulation" with TeraExchange, meaning that they were in the process of testing and integrating TeraExchange with their own systems.

62.    TeraExchange successfully pitched their platform to large proprietary trading firms that were members of the FIA Principal Traders Group, including, *inter alia*, KCG Holdings, DRW Holdings, LLC, Chopper Trading LLC, Teza Technologies, HTG Capital Partners, and Global Electronic Trading Company (GETCO), LLC. These six firms had committed to being CDS market makers on TeraExchange and had signed EULAs and/or were in simulation with the platform.

63.     These firms had different trading strategies from the Dealer Defendants and engaged in high-volume trading strategies and were largely risk neutral. These entities were more eager than traditional dealers to trade CDS more aggressively and were willing to quote bid/ask spreads at levels that were designed to be immediately executable. Thus, these entities were generally willing to trade CDS at tighter bid/ask spreads than the Dealer Defendants and provide better pricing to the CDS market.

64.     Plaintiffs had the necessary commitments to ensure liquidity in CDS on its all-to-all CLOB, and customers were eager to begin executing CDS trades on TeraExchange.

65.     The top clearinghouses also signed on to clear CDS and other derivatives executed on TeraExchange. For example, TeraExchange entered into clearing services agreements with ICE, the largest clearinghouse for CDS, as well as the CME and LCH.Clearnet. The CME, ICE, and LCH.Clearnet were responding to customer interest in agreeing to clear trades executed on TeraExchange, as CDS customers stated they wanted to trade on the platform. But, as discussed *infra* ¶¶ 73 – 78, the Dealer Defendants, who were the members of the clearinghouses and thus submitted CDS customers' trades to the clearinghouse for clearing, jointly refused to clear any trades executed on TeraExchange.

66.     Market participants and observers expected that trading CDS and other derivatives on SEFs like TeraExchange would result in a fundamental shift in the market. Bloomberg News noted that TeraExchange and other SEFs were "poised to take business from the big banks that have dominated swaps trading."[17]

---

[17] Matthew Leising, *A Safer Way to Trade Interest Rate Swaps*, BLOOMBERG (Feb. 27, 2014), available at http://www.bloomberg.com/news/articles/2014-02-27/interest-rate-swaps-trading-comes-out-of-the-shadows.

67.     TeraExhange was poised to be such a disruptive force in the CDS market that by late 2013, investors had increased their estimate of TeraExchange's valuation to be over $50 million, before a single swap trade ever took place on the platform.

**D.   TeraExchange had commitments from inter-dealer brokers to use its platform.**

68.     A large portion of the CDS market consists of dealer-to-dealer trading. TeraExchange accordingly pursued a business strategy focused on signing up interdealer brokers that serve as the Dealer Defendants' intermediaries in CDS trading. TeraExchange's sales team focused on international interdealer brokers because of Dodd-Frank's "cross border" SEF requirement for swap trades. Under Dodd-Frank, all swap trades involving "U.S. Persons,"[18] whether trading domestically or internationally, must be executed through a CFTC-registered SEF. This means that any interdealer broker handling trades for a foreign branch or affiliate of a U.S. bank (like Dealer Defendants Citigroup and JPMorgan) had to execute those trades on a SEF or become a SEF themselves.

69.     Plaintiffs knew from their own experience that building and gaining approval of a SEF was a difficult and expensive proposition for many interdealer brokers, especially smaller ones. Rather than try and build their own SEF, TeraExchange offered these interdealer brokers a cost-effective way to execute their trades and fulfill Dodd-Frank's requirements for a fee. As an independent platform, TeraExchange was also not a competitor to these inter-dealer brokers, unlike the interdealer SEFs ICAP, GFI, BGC, and Tradition. If these international inter-dealer brokers did not use TeraExchange as their executing SEF, they would be forced to route execution business to their competitors to be compliant with Dodd-Frank.

---

[18] Dodd-Frank defines a U.S. person as any entity "that is organized under the laws of a state or other jurisdiction in the United States or having its principal place of business in the United States." *Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations*, 78 Fed. Reg. 45,292 (July 26, 2013). The CFTC's Final Guidance stated that a foreign branch of a U.S. bank registered with the CFTC as a swap dealer is a U.S. person for purposes of the CFTC's Dodd-Frank regulations. *Id.*

70.     This strategy proved successful. On January 15, 2014, TeraExchange announced agreements with twelve international interdealer brokers who executed swaps trades for the foreign branches of the U.S. Dealer Defendants and other global banks to use the platform.[19] These interdealer brokers, which included R.P. Martin, OTCex, GMG Brokers, Cloud9, Sunrise Brokers, LLC, and Continental Capital Markets, committed to using TeraExchange.

71.     TeraExchange set up trading accounts for over 100 of R.P. Martin's and OTCex's clients, which included the Dealer Defendants. OTCex, R.P. Martin, GMG and other interdealer brokers expressed their commitment to Tera to start executing trades on TeraExchange.

**E. Anonymous all-to-all swap trading begins on TeraExchange.**

72.     On June 13, 2014, the first ever anonymous swap trade on any all-to-all CLOB platform was executed on TeraExchange. The trade was between Chimera Investment Corp. ("Chimera") and Mitsubishi UFJ Financial Group ("Mitsubishi UFJ"). Chimera's investment portfolio was managed by Fixed Income Discount Advisory Corp., a subsidiary of Annaly Capital Management ("Annaly"). The June 13, 2014 trade was cleared through the CME clearinghouse by BNP Paribas's FCM, for Chimera, and by JPMorgan's FCM for Mitsubishi UFJ.

## II.   DEFENDANTS CONSPIRED TO COLLECTIVELY BOYCOTT TERAEXCHANGE

73.     Dealer Defendants' collective response to the first trade on TeraExchange was ultimately fatal to TeraExchange's CDS business. For example, although BNP Paribas had cleared the trade, it took action the next business day when it advised TeraExchange that BNP would not clear any more trades on TeraExchange until it completed a know-your-customer

---

[19] Press Release, TeraExchange, TeraExchange and European Brokers Reach Landmark SEF Trading Agreement, *available at* https://www.insurancenewsnet.com/oarticle/TeraExchange-and-European-Brokers-Reach-Landmark-SEF-Trading-Agreement-a-446311.

("KYC") review of Tera, which included a review of Tera's Rulebook. BNP Paribas' own employees even seemed surprised at the need to perform an additional investigation for a SEF. Separately, Stephanie Leung, Vice President of OTC Client Clearing at BNP Paribas, asked Chimera/Annaly "to advise [its] trading [desk] to hold off on executing any more trades" on TeraExchange while BNP resolved operational issues.

74.     Similarly, JPMorgan, which cleared the Mitsubishi UFJ side of the first trade on TeraExchange, also did not clear any trades on TeraExchange following that first trade, citing amorphous technical issues, including the KYC review and/or an audit of Tera's rulebook. Separately, JPMorgan prohibited its brokers from using TeraExchange to execute the bank's trades.

75.     Similarly, on the next business day, UBS confirmed in an internal email that it would not cooperate with TeraExchange. This is consistent with UBS's refusal to trade on TeraExchange after the trade, a departure from TeraExchange's previous discussions with UBS.

76.     Like the other Dealer Defendants, Citi indicated it would not be trading or clearing on TeraExchange and thereafter never cleared a trade on TeraExchange.

77.     As detailed above, after June 16, 2014, and consistent with their boycott, BNP Paribas, Citi, JPMorgan, and UBS did not clear *any* trades on TeraExchange.

78.     There was no legitimate reason for these Dealer Defendants to refuse to clear any trades on TeraExchange. Clearing trades on TeraExchange did not pose any risk to the Dealer Defendants, and they would have received fees for doing so. Moreover, prior to the trade, many of the Dealer Defendants had claimed an interest in trading on TeraExchange. To that end, TeraExchange executives had met with senior-level employees at each of the Dealer Defendants.

Thus, Dealer Defendants' conduct following the trade evidences their collective boycott of TeraExchange.

### A.  The Dealer Defendants refused to trade on TeraExchange

79.     For example, UBS claimed it wanted to use TeraExchange as part of its "agency execution model," under which UBS, operating from its FCM division, would serve as introducing broker and route customers' orders to a SEF for pairing and execution. In this way, UBS would act as the SEF member intermediating client orders, removing the need for clients to become a direct participant of the SEF.

80.     After months of negotiations, UBS repeatedly requested to revise TeraExchange's core documents, including its Rulebook and EULA. In April 2014, two months before the first successful trade on TeraExchange, UBS finally approved TeraExchange's revisions to its core documents and TeraExchange provided UBS with the documents for execution. However, UBS never executed the TeraExchange EULA. TeraExchange had a similar experience with UBS's co-conspirator, Credit Suisse.

81.     Had they allowed TeraExchange to enter the market, the Dealer Defendants would have conducted CDS trades on TeraExchange because of the existence of the "best execution" rule.[20] The best execution rule refers to a trading entity's legal duty to take all reasonable steps to secure the best price available when executing a customers' trade. With better pricing on CDS available on TeraExchange's anonymous all-to-all CLOB, CDS dealers, including the Dealer Defendants, would have followed client demand and brought their own liquidity to TeraExchange's platform. The best execution rule is also part and parcel of the

---

[20] FINRA Rule 5310. "Some of the factors a broker must consider when seeking best execution of customers' orders include:  the opportunity to get a better price than what is currently quoted, the speed of execution, and the likelihood that the trade will be executed." SEC.gov, *Best Execution*, https://www.sec.gov/fast-answers/answersbestexhtm.html.

reason why the Dealer Defendants worked together to boycott TeraExchange: maintaining their

supracompetitive profits on CDS. By preventing Tera's anonymous all-to-all CLOB from

launching, the Dealer Defendants both ensured that the bid/ask spreads on the CDS they

transacted with customers on RFQ-only SEFs remained grossly inflated and that there was no

lower-cost alternative like TeraExchange for executing CDS.

**B.** **The Dealer Defendants used their control over CDS clearing to prevent CDS trades from occurring on TeraExchange.**

82.     The Dealer Defendants leveraged Dodd-Frank's centralized clearing requirement

to carry out their boycott of TeraExchange through two principal means. First, the Dealer

Defendants used their internal clearing divisions, or FCMs, to block buy-side customers from

trading on TeraExchange by refusing to clear transactions executed on Tera's all-to-all CLOB

platform. Second, the Dealer Defendants quoted TeraExchange customers obscenely high

clearing fees that made trading on the platform uneconomic, while simultaneously offering to

clear similar trades at a discount if not for free if they traded on other SEFs that exclusively used

RFQ and did not allow anonymous trading.

83.     Ironically, Dodd-Frank's centralized clearing requirement, which was intended to

improve the derivatives market, gave the Dealer Defendants complete control over which SEFs

buy-side customers could trade on. In the United States, clearing operates through an "agency

model," where the risk of default on any given transaction is not carried by the clearinghouse

itself but by its "clearing members," typically large banks like the Dealer Defendants that can

post enough collateral to guarantee performance on every trade.[21] Buy-side customers do not

have access to the clearinghouse directly and must convince a clearing member to submit their

---

[21] For example, the CME currently requires clearing members to hold at least $50 million in capital and contribute at least $50 million in cash to its guaranty fund to clear CDS. *See Summary of Requirements for CME's OTC Derivatives Clearing Membership IRS and CDS Only,* CME GROUP (July 2016), *available at* http://www.cmegroup.com/clearing/files/otc-summary-irs-cds-only-july-2016.pdf.

trade in order to have it cleared. The agency model therefore gave the Dealer Defendants control over CDS trading by making them the gatekeepers to the clearinghouse.

84.     The Dealer Defendants' FCMs controlled both the pre- and post-trade mechanisms of clearing. Pre-trade, FCMs must confirm that their customers are sufficiently creditworthy to execute and clear any given trade before it takes place. A trade cannot move forward if a customer fails this pre-trade credit check. A pre-trade credit check is similar to checking whether a customer can make a large purchase on a credit card based on their available credit limit. When a customer initiates a prospective trade, the SEF must then query that customers' clearing bank (or their FCM) via a "push" or "ping" method.[22] The FCM responds to the SEF, confirming whether the customer had sufficient credit. If so, the FCM permits the trade to proceed to execution and post-trade central clearing.

85.     To prevent customers from trading on TeraExchange, the Dealer Defendants' FCMs simply refused to participate in this process and would not extend pre-trade purchasing power to buy-side customers that wanted to use Tera's all-to-all CLOB. Because Dodd-Frank required SEFs to conduct pre-trade credit checks ahead of every transaction, the Dealer Defendants' collective refusal stopped every prospective CDS trade on TeraExchange in its tracks.

86.     This misconduct was uneconomic and is indicative of collusion because it is against the FCMs' own independent self interest to refuse to clear trades on TeraExchange. The Dealer Defendants' FCMs provide clearing and settlement services for the buy-side community,

---

[22] A pre-trade credit check can occur via either a "ping" or a "push" system. Under a "ping" system, once an order has been entered, a SEF will send a real time electronic message to a FCM at a credit hub, or ping a FCM on a per-trade basis to confirm if a customer has sufficient credit to conduct that trade. Under a "push" system, a FCM will pre-authorize a customer to clear trades up to a certain credit limit, by providing or "pushing" a credit limit to a SEF prior to the start of the trading day, a practice commonly referred to as "pushing limits." As an example, a dealer might "push" a limit of $500 million to a SEF for its customer, meaning that the customer could trade and clear up to $500 million of CDS on that SEF without needing to obtain further approval.

charging a fee for every trade they submit to the clearinghouse. FCMs should, as a result, be agnostic to which SEFs their customers use, because the FCMs will generate fees for clearing its customers CDS transactions regardless of which platform the trade is executed on. An FCM operating according to its own rational economic self-interest would, subject to credit limits, want to maximize the amount of trades it clears for customers, irrespective of which SEF they decide to use.

87.     The Dealer Defendants were able to implement their collective refusal to clear trades on TeraExchange because there was no check on their control of the clearing business. The Dealers, including Dealer Defendants, have owned ICE Clear, the largest clearinghouse for CDS, since its formation in December 2008.[23] The Dealers also make up nearly all of the clearing members for ICE Clear, meaning that CDS customers have no choice but to attempt to clear their CDS trades through them. For example, ICE Clear had ten clearing members in 2008, consisting exclusively of the Dealerss. Today, the Dealers (including their subsidiaries and affiliates) make up 80%, or 24 of the 30 clearing members, with other large dealer banks taking up the remaining slots. Further, ICE Clear requires its participants to have at least $5 billion in capital to join, ensuring that only the largest banks like the Dealer Defendants can be clearing members.

88.     The Dealers likewise make up nearly all the clearing members for CDS at the other two major clearinghouses. At the CME, the Dealers constitute 11 of the 13 clearing

---

[23] ICE Clear is wholly owned by ICE US Holding Company L.P., which in turn is 50% owned by its general partner, ICE US Holding Company GP LLC and 50% by Goldman Sachs, Citi, JP Morgan, Bank of America, Merrill Lynch, Morgan Stanley, Deutsche Bank, UBS and Credit Suisse. ICE and these Dealers each share in ICE Clear's profits.

members who clear CDS.[24] And at LCH.Clearnet, the Dealers make up 10 of the 12 CDS

clearing members.[25]

89.     Control over CDS clearing is more highly concentrated in the hands of the

Dealers than for most other derivatives. By way of comparison, there are 54 clearing members at

the CME for futures, consisting of a much more diverse group of non-Dealers and non-bank

FCMs. The Dealers and their affiliates make up only 25% of the total number of CME futures

clearing members. Likewise for clearing interest rate swaps at the CME, the Dealers (including

subsidiaries and affiliates) make up 61%, or 16 of the 26 clearing firms. Thus, in CDS, unlike in

the market for futures and interest rate swaps, the Dealers have nearly complete control of end-

user access to clearing.

90.     Additionally, the Dealer Defendants' FCMs were able to coordinate their

activities because, *inter alia*, their clearing operations communicate regularly with each other.

For example, Piers Murray, who until recently was the Global Head of Fixed Income Prime

Brokerage at Deutsche Bank, had previously worked as the Global Head of Rates Clearing at

JPMorgan.[26] Mr. Murray regularly communicated with his counterparts at other Dealers, such as

Robert Burke, Co-Head of Bank of America's Global Futures and Derivatives Clearing Services,

and Michael Dawley, the head of Goldman Sachs' FCM.

91.     The Dealers told Tera that they would not clear trades on TeraExchange. For

example, TeraExchange met with Bob Burke, the head of clearing for Bank of America, on

---

[24] Barclays, BNP Paribas, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, J.P. Morgan, Bank of America, Morgan Stanley, and UBS are CME clearing members who clear CDS products, plus Wells Fargo and Société Générale.

[25] Bank of America, Barclays, BNP Paribas, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, and Morgan Stanley serve as clearing firm members for CDS on LCH.Clearnet. *See* http://www.lch.com/members-clients/members/current-membership.

[26] Matt Cameron, *Deutsche Snares JPMorgan's Murray for Clearing Role*, Rɪsᴋ (July 2, 2012), http://www.risk.net/risk-magazine/news/2188410/deutsche-snares-jp-morgan-s-murray-clearing-role.

multiple occasions to discuss clearing trades on TeraExchange. On or about March 8, 2014, Burke responded that his bosses would never let him.

92.     HSBC's FCM gave TeraExchange the runaround for over a year before finally refusing to clear for the platform. During this period, Julianna Salazar, HSBC's Vice President of Futures & OTC Clearing, required nearly half a dozen demonstrations of TeraExchange's platform and its connectivity to HSBC's FCM over the course of her consideration whether HSBC's FCM would connect to TeraExchange. Despite repeated successful demonstrations, Ms. Salazar refused to provide a direct answer on whether HSBC's FCM would clear trades on TeraExchange. At the end of nearly 18 months, Ms. Salazar finally informed Tera in or around March 2014 that HSBC would not clear trades on TeraExchange without the approval of HSBC's trading desks. This approval was never given.

93.     Sometimes the Dealer Defendants did not refuse outright to clear trades on TeraExchange, but quoted punishingly high fees to do so, making the trade uneconomic. For instance, ANZ Bank, one of the largest banks in the world, signed on to use TeraExchange. ANZ cleared its trades through FCMs at Citi and Bank of America. When ANZ asked Citi to clear its trades on TeraExchange in April 2014, Chris Perkins, the head of clearing at Citi, informed ANZ that Citi would clear and settle ANZ's trades *for free* if they transacted with them directly via an RFQ protocol on Bloomberg or the Dealer Defendant-owned Tradeweb, but would charge them excessively high clearing fees to trade on TeraExchange. These outrageously high fees made the transactions uneconomical, and ANZ and other customers backed out of the proposed trade on TeraExchange.

94.     As a direct result of the barriers that the Dealer Defendants put into place, other market participants began to waver in their support for TeraExchange's platform. Susquehanna,

for instance, withdrew its commitment to TeraExchange in October 2014, three months after the
Dealer Defendants initiated their boycott.

95.      Absent the Dealer Defendants' conspiracy, these buy-side entities could have
simply found another FCM to clear their trades. But the Dealer Defendants coordinated their
activities, and collectively made it known to the buy-side that they would refuse to deal with any
firm they caught trading on TeraExchange.

96.      The Dealer Defendants' collective boycott of TeraExchange starved it of the
liquidity it needed to succeed. Absent the Dealer Defendants' anticompetitive boycott, buy-side
firms and other liquidity providers would have traded CDS on TeraExchange.

### C.    The Dealer Defendants prohibited inter-dealer brokers from using TeraExchange.

97.      TeraExchange successfully signed up a dozen global inter-dealer brokers to use
TeraExchange to execute their CDS and other swap trades in order to meet Dodd-Frank's cross-
border requirements. *See supra* ¶¶ 68-71. The Dealer Defendants unjustifiably delayed and
ultimately refused to give their permission for these inter-dealer brokers to execute trades
involving the Dealer Defendants as a counterparty on TeraExchange. If TeraExchange had been
able to move forward with doing business with these inter-dealer brokers, it would have been
able to grow its business and expand its offerings to buy-side customers. But the Dealer
Defendant refused.

98.      These inter-dealer brokers serve as introducing brokers for their clients—*i.e.* the
Dealer Defendants and other banks. They thus had to obtain the consent of their customers to use
TeraExchange to execute trades. The Dealer Defendants all universally refused to give their
consent. For example, Laura Martin of Citi informed Ian Spittlehouse, administrative director of
inter-dealer broker OTCex, on February 12, 2014 that "per internal policy" Citi would not allow
OTCex to use TeraExchange, noting that "Citi is not currently signed onto the Tera SEF

31

Rulebook." After OTCex pointed out that Citi did not need to join TeraExchange or sign onto its rulebook (which had been previously reviewed by the CFTC), Ms. Martin responded by saying that Citi's refusal to allow inter-dealer brokers to execute trades on TeraExchange was "more of an internal policy rather than a regulatory one." This confirmed that there was no valid basis for Citi's refusal. Spittlehouse replied and entreated Citi to allow OTCex to use TeraExchange.  He noted that "Tera is a preferred solution for us – [it] is the only viable SEF that is not owned by a direct competitor."

99.    R.P Martin was told by multiple Dealer Defendants that it could not use TeraExchange to execute trades involving the Dealer Defendants as counterparties. R.P. Martin informed Tera of these communications. On March 6, 2014, Tera had a teleconference with R.P. Martin's president John Lidyard and other R.P. Martin executives. During this call, Tera and R.P. Martin discussed the Dealer Defendants' stonewalling and agreed that R.P. Martin would apply pressure to try and get permission from the Dealer Defendants' trading desks. The Dealer Defendants never relented. At the same time, Tera and R.P. Martin moved forward with executing trades between other second-tier dealers and alternative liquidity providers. This effort led to the June 13, 2014 trade on TeraExchange between Mitsubishi UFJ and Annaly Capital. R.P. Martin was the introducing broker for that trade. In light of the Dealer Defendants' refusal to allow anyone to trade on TeraExchange, no further trades occurred on TeraExchange and R.P. Martin was eventually forced to back out of its commitment to use TeraExchange.

100.    Another inter-dealer broker who wanted to use TeraExchange, GMG Brokers Ltd. ("GMG"), informed Tera that JPMorgan was inexplicably delaying its approval for GMG to do so. TeraExchange and GMG both reached out to JPMorgan to resolve the issue. In May 2014, TeraExchange provided JPMorgan with a list of JPMorgan's own traders that wanted to execute

trades on TeraExchange through interdealer brokers GMG, R.P Martin, and OTCex. But JPMorgan would not budge. For example, on May 6, 2014, Amit Bhuchar, JPMorgan's Global Fixed Income Chief Operating Officer, told TeraExchange that JPMorgan "had not yet signed [TeraExchange's] Rulebook" as the reason why GMG could not proceed with executing trades on TeraExchange.

101.    On July 2, 2014, TeraExchange's President & COO Leonard Nuara reached out to Carl Kennedy, then Assistant General Counsel and Executive Director at JPMorgan. Nuara informed Kennedy that TeraExchange had received "numerous requests from the IDBs (e.g. GMG in Dubai, R.P. Martin and OTCEx/HPC in London, ContiCap in Switzerland) regarding the status of Tera's approval. These IDBs merely wish to act as Introducing Brokers to submit TeraExchange bilaterally negotiated trades which involve JPM as one of the counterparties . . . . [Can we] at least notify these IDBs they can submit bilateral trades to Tera?" Kennedy replied that "there are no updates at this time. [T]he businesses make the final decision."  But JPMorgan refused to allow the interdealer brokers to ever execute on TeraExhange.

102.    Despite the Dealer Defendants' boycott, interdealer brokers have continued to express interest in using TeraExchange. As recently as July 2016, for example, Laurent Girouille, Chief Operating Officer of GMG, emailed TeraExchange and expressed continued interest in using TeraExchange. Girouille noted that "we had issue[s] getting approval from banks" to "use your solution." Girouille also stated that "JPMorgan was the biggest issue at the time" in preventing GMG from doing so.

103.    The Dealer Defendants uniformly took the position that they would not allow inter-dealer brokers to execute trades on TeraExchange. The reason became clear when

TeraExchange learned that the Dealer Defendants regarded TeraExchange's platform as a "Trojan Horse."

**D.  The Dealer Defendants insisted on "name give-up" to deter buy-side participation on TeraExchange and other all-to-all SEFs.**

104.    To keep the CDS market a two-tiered structure, the Dealer Defendants agreed to insist on post-trade name disclosure, or "name give-up," to discourage buy-side participation on TeraExchange and other all-to-all anonymous SEFs. Name give-up refers to the practice of identifying the names of the counterparties to each other after execution of a CDS trade.

105.    The practice of post-trade name give up originated when swaps were not centrally cleared and the parties to the transaction needed to know the identity of the counterparty they were trading with in order to manage risk. Central clearing eliminated this problem.

106.    Buy-side firms and independent SEFs have overwhelmingly criticized the continued use of this practice in a centrally cleared regime because, "[i]n practice, in a SEF environment, this unnecessary disclosure of swap counterparties only serves to inform the dealers of the non-dealer firms [or] banks that are attempting to trade on their platforms, and invit[es] retaliation."[27] Name give-up thus serves as a surveillance mechanism because it allows the Dealer Defendants to determine which trading platforms abide by the Dealer Defendants' rules and which do not.

107.    For instance, if an order book transaction closes with a dealer on one side, that dealer is immediately able to see if a buy-side participant: (a) was allowed access to the order book; and (b) entered into a transaction over the order book rather than in the over-the-counter (or, more recently, RFQ) systems. And because the Dealer Defendants are the primary liquidity

---

[27] Dennis Kelleher, Caitlin Kline, & Victoria Daka, *Stopping Wall Street's Derivatives Dealers Club,* BETTER MARKETS (Feb. 2016) at 13, https://www.bettermarkets.com/sites/default/files/Better%20Markets%20Policy%20Brief%20-%20Stopping%20Wall%20Street%E2%80%99s%20Derivatives%20Dealers%20Club.pdf.

providers to the CDS market, they are likely to be the counterparties in most trades with buy-side customers, even on an all-to-all trading platform that enforces name give-up, meaning that they can quickly identify any buy-side entity trading on such a platform.

108.    Even the Dealer Defendants acknowledge that name give-up should not continue to exist. For instance, Declan Graham, Executive Director of UBS Investment Bank admitted during an October 26, 2015 panel discussion at SEFCON, an annual conference on issues affecting SEFs, that name give-up on CLOBs is pointless for cleared swaps. Rana Chammaa, head of rates and credit eTrading sales at UBS, acknowledged in another SEFCON panel that customers are "sitting on the sidelines because they [SEFs] still maintain post-trade order give-up."[28]

109.    Former CFTC Chairman Timothy Massad has said he is "very concerned" about name give-up for "trades taking place on a central limit order book that are then immediately cleared," and that he has "not heard a compelling justification" for the practice of name give-up in today's CDS market.[29] Richard Mazzella, former Chief Operating Officer for Global Fixed Income at Citadel Investment Group ("Citadel") noted, "[i]f you are trading in [an order book] where you are pre-trade anonymous then you should also be post-trade anonymous . . . [W]hen you cut through the arguments for post-trade disclosure, it's really just a means to discourage people from participating in the [order book]."[30] And former CFTC Commissioner Mark Wetjen

---

[28] Ivy Schmerken, *Swap Markets Debate Anonymous Trading in SEFs*, Wall Street & Technology (Jan. 5, 2015), http://www.wallstreetandtech.com/trading-technology/swap-markets-debate-anonymous- trading-in-sefs/d/d-id/1318257.

[29] Peter Madigan, *Massad: Sefs Fear Retaliation if They End Name Give-up*, Risk (Apr. 23, 2015), http://www.risk.net/risk-magazine/news/2405534/massad-end-users-shut-out-from-sefs-due-to-post-trade-name-give-up.

[30] Peter Madigan, *Buy-Side Firms Slam Broker Sefs Over Lack of Anonymity*, Risk (Oct. 24, 2014), http://www.risk.net/risk-magazine/news/2377259/buy-side-firms-slam-broker-sefs-over-lack-of- anonymity.

has stated publicly that it is "difficult to rationalize trading protocols that reveal the identities of counterparties on an anonymous, central limit order book."[31]

110.    Getting rid of name give-up is also very popular with buy-side firms, who want to engage in all-to-all, anonymous trading. "Some asset managers have claimed their use of [CLOBs] will increase if they are allowed to trade anonymously."[32] Richard Mazzella explained that "removing these barriers is important in allowing" a true order book to come to market.[33] Ken Griffin, founder of Citadel, noted that "anonymous markets foster competition," adding that "[i]t should not matter who provides the best price."[34] And George Harrington, former Global Head of Fixed Income, Currency, and Commodity Execution at Bloomberg LP, stated during a panel discussion at SEFCON on October 26, 2015 that there is "a good deal of demand for anonymous trading" for cleared swaps.

111.    The Dealer Defendants recognized the importance of name give-up in maintaining a bifurcated dealer-to-client and dealer-to-dealer market and conspired to keep the practice in place by making their provision of liquidity to a trading platform conditional on the use of the practice. Pursuant to their agreement, the Dealer Defendants collectively boycotted any trading platform, including TeraExchange, that refused to include name give-up as a feature.

---

[31] *See* CFTC, *Remarks of Commissioner Mark Wetjen before the Cumberland Lodge Financial Services Policy Summit* (Nov. 14, 2014), http://www.cftc.gov/PressRoom/SpeechesTestimony/opawetjen-10.

[32] Peter Madigan, *Massad: Sefs Fear Retaliation if They End Name Give-up*, RISK (Apr. 23, 2015), http://www.risk.net/risk-magazine/news/2405534/massad-end-users-shut-out-from-sefs-due-to-post-trade- name-give-up

[33] Peter Madigan, *Buy-Side Firms Slam Broker Sefs Over Lack of Anonymity*, RISK (Oct. 24, 2014), http://www.risk.net/risk-magazine/news/2377259/buy-side-firms-slam-broker-sefs-over-lack-of- anonymity.

[34] Kris Devasabai, *Citadel's Ken Griffin on Amazon, Bloomberg and Swap Market Reform*, RISK (Oct. 31, 2014), http://www.risk.net/risk-magazine/profile/2377762/citadels-ken-griffin-on-amazon-bloomberg- and-swap-market-reform.

112.    The Dealer Defendants also ensured that name give-up persisted through a service known as MarkitWIRE,[35] which is operated by MarkitSERV. MarkitSERV is dominated by the Dealers: Brad Levy (formerly of Goldman Sachs' Principal Strategic Investments group) is currently the CEO of MarkitSERV, and Stephen Wolff (formerly the Head of Interest Rate Trading at Deutsche Bank) was, until recently, the Head of Group Corporate Strategy at MarkitSERV. Recognizing that central clearing and exchange trading posed a threat to the Dealers' interests, Levy, Wolf and others were the chief architects of the scheme to use post-trade name give up as one of the mechanisms used to enforce the bifurcated market structure.

113.    MarkitWIRE is a trade processing service for CDS and other asset classes offered by MarkitSERV, meaning it delivers trades to clearinghouses once they have been executed by counterparties. Although it would be simpler and more efficient to design CDS trading platforms that feature "straight-through processing"—where a SEF immediately sends a trade to a clearinghouse once it is executed—the Dealers forced inter-dealer brokers to send trades to MarkitWIRE before they were cleared.[36] MarkitWIRE then offered the counterparties to a CDS transaction a "last look" at the trade, where they learned each other's identities and had the option to terminate the transaction. This process was inefficient and more cumbersome than exchange trading, and it subjected the parties to unnecessary post-trade name give-up.[37]

114.    The inter-dealer brokers only used MarkitWIRE, and disclosed the names of the parties to a CDS transaction post-trade, because the Dealers collectively insisted that they do so. Buy-side firms have complained that this practice "is applied to please dealers and that it

---

[35] Prior to its acquisition by Markit in 2008, MarkitWIRE was known as Swapswire. Both Swapswire and Markit were created and controlled by the Dealers.

[36] *See* Peter Madigan, *CFTC to Clamp Down on Delays in Swap Clearing*, RISK (Aug. 5, 2015), http://www.risk.net/risk-magazine/feature/2420436/cftc-to-clamp-down-on-delays-in-swap-clearing.

[37] *Id.* (citing a CFTC staffer as stating: "It is not uncommon for it to take more than an hour for counterparties to agree [to] a trade confirmation on affirmation platforms such as Markitwire").

discourages non-banks from trading, helping to preserve the traditional market structure in which dealer-to- client and interdealer markets were separate."[38]

115.    MarkitWIRE was designed as way for the Dealers to control the flow of information in the CDS and other derivatives markets. In a market with central clearing, like that for CDS, there is no need to send trades to MarkitWIRE for the "last look" and forced name give-up.

116.    As a result of collective pressure from the Dealers, numerous SEFs agreed to impose name give-up on their platforms. Today, the largest interdealer SEFs—BGC, DealerWeb, GFI, ICAP, IGDL, Tullett Prebon, and Tradition—all maintain name give-up, thereby deterring buy-side entities from trading on them. These interdealer SEFs recognize the collective power of the Dealers, and do not want to bite the hand that feeds them. The Dealers and inter-dealer brokers thus work together to ensure that buy-side firms are not trading on inter-dealer broker platforms. As a direct consequence of maintaining name give-up, there has been no meaningful volume on the few order-book platforms built by SEFs to date.

117.    Name give-up also serves as an effective roadblock to all-to-all trading by creating an information asymmetry in forcing the buy-side customer to reveal its trading positions, and thus elements of its trading strategies, to both dealers and other buy-side customers, which may be able to exploit that information against them. Many buy-side customers go to great lengths to keep their trading strategies confidential. As Ken Griffin explained, name give-up allows dealers to unfairly "position their book by taking advantage of their trading counterparties' market insights."[39]

---

[38] *Id.*

[39] Kris Devasabai, *Citadel's Ken Griffin on Amazon, Bloomberg and Swap Market Reform*, RISK (Oct. 31, 2014), http://www.risk.net/risk-magazine/profile/2377762/citadels-ken-griffin-on-amazon-bloombergand-swap-market-reform.

118.    Michael O'Brien, Director of Global Trading at Eaton Vance, has stated: "I don't want to show the size of my trades, I don't want people to know how I'm trading. Information is the most valuable asset we have."[40] "Investors have complained that they are unable to break into the inter-dealer markets because they are not anonymous—with names given up after trading."[41] Buy-side firms have expressed that ending name give-up on broker SEFs would remove the ability for dealers to effect retribution on their clients.

E.    **The Dealer Defendants placed transgressors in the "penalty box"**

119.    At the same time the Dealer Defendants collectively prevented TeraExchange's anonymous all-to-all CLOB from succeeding, they themselves continue to use SEF platforms that offer them the benefits of this kind of trading. Tradeweb's dealer-only platform Dealerweb and a number of interdealer brokers, including ICAP, operate such anonymous all-to-all SEFs, but these are open only to dealers.

120.    There is no technical reason why these entities could not allow buy-side entities to trade—and trade anonymously—on their platforms. The Dealers keep the market divided this way by pressuring interdealer SEFs not to allow this, "threaten[ing] to withdraw liquidity from any trading platform that admits buy-side firms onto its [order book]."[42] This practice is known as being placed in "the penalty box."

121.    Just as they did to TeraExchange, the Dealers pull liquidity from platforms that allow anonymous trading. For example, when an interdealer SEF for CDS "run by GFI Group

---

[40] Charles Levinson, *Startup Challenges Dominance of Big Banks in Derivatives Markets*, REUTERS (Mar. 10, 2015), http://www.reuters.com/article/2015/03/10/markets-derivatives-exchange-insight-gra- idUSL1N0WB2D520150310.

[41] *CFTC not planning on anonymity for swaps market,* FINANCIAL TIMES (Oct. 27, 2015), http://www.ft.com/fastft/414101/us-swaps-market.

[42] Peter Madigan, *Massad: Sefs fear retaliation if they end name give-up*, Risk (Apr. 23, 2015), http://www.risk.net/regulation/dodd-frank-act/2405534/massad-sefs-fear-retaliation-if-they-end-name-give.

said it would allow anonymous trading, several banks threatened to pull their business off the platform."[43] In particular, GFI "received heated phone calls from executives at Credit Suisse Group AG and J.P. Morgan Chase" over the introduction of trade anonymity for the buy side.[44] The complaining banks, which planned to use GFI to trade with other banks, "contended that allowing nonbanks to trade anonymously could hurt their ability as swaps providers."[45] In the face of this pressure, GFI promptly reversed course.

122.    As one former inter-dealer broker's employee explained, when the inter-dealer broker attempted to bring buy-side entities onto its trading platform in a different asset class, the Dealers discovered this through name give-up and responded with collective threats "to simply move their business to another broker."[46] He stated that, as a result, the inter-dealer broker relented, limiting its platform to dealers. The employee added: "We didn't have much choice but to shut it down."[47]

123.    When asked during a recent SEFCON panel discussion why the manner in which buy-side firms trade has not evolved in the wake of Dodd-Frank, Scott Fitzpatrick, the CEO of Tradition SEF (an inter-dealer broker), bluntly explained that inter-dealer broker SEFs were not willing to stand up to the Dealers and go anonymous because of the risk "of the loss of liquidity."The Dealers threaten any buy-side customer with being put in the "penalty box" if it attempts to trade on an anonymous all-to-all SEF, whether it is operated by an inter-dealer broker or an independent SEF like TeraExchange. The Dealer Defendants refuse to trade with the

[43] Charles Levinson, *Startup Challenges Dominance of Big Banks in Derivatives Markets*, REUTERS (Mar. 10, 2015), http://www.reuters.com/article/2015/03/10/markets-derivatives-exchange-insight-gra- idUSL1N0WB2D520150310.

[44] Katy Burne, *CFTC to Propose Swaps Anonymity*, WALL ST. J. (Feb. 16, 2015), http://www.wsj.com/articles/cftc-to-propose-swaps-anonymity-1424132424.

[45] *Id*.

[46] Robert Mackenzie Smith, *Interdealer Brokers Need to Change, Say Critics*, RISK (Sept. 14, 2015), http://www.risk.net/risk-magazine/feature/2424954/risk-interdealer-rankings-2015-sector-needs-more- change-say-critics.

[47] *Id*.

investor in any venue if they do. Because the Dealer Defendants are the primary market makers in the CDS market, buy-side customers acquiesce to the Dealer Defendants' demands in order to avoid being cut off from the ability to trade. In other cases, the Dealer Defendants collectively threaten a buy-side customer with withdrawal of key banking services and make it impossible to trade other derivative products as well. These threats carry great weight as they can cripple a business through seizing up of cash flow.

124.    The Dealer Defendants' conspiracy has had a chilling effect on CDS market participants, which TeraExchange witnessed firsthand. For example, in October 2014, Susquehanna backed out of its agreement with TeraExchange after realizing that the Dealer Defendants would punish it for its involvement in the platform.

125.    The Dealer Defendants also leveraged their collective market share to signal to inter-dealer brokers that they would suffer a boycott should they participate in an all-to-all anonymous platform. This strategy was effective because brokers, as intermediaries in the derivatives markets, had close connections with other market participants and could disseminate information rapidly.

126.    The financial media reported on the chilling effect caused by the Dealer Defendants' threatened retaliation, ensuring that all participants in the market knew the consequences of using a CLOB platform. For example, David Weiss, a SEF expert at research firm Aite Group, reported that the Dealer Defendants told inter-dealer brokers that "if you [utilize a competitor SEF] I'll pull my business and I'll tell everyone else that I'm pulling my business and I'll tell them why."[48]

---

[48] Karen Brettell, *Banks' Pressure Stalls Opening of U.S. Derivatives Trading Platform*, REUTERS (Aug. 27, 2014), *available at* http://www.reuters.com/article/2014/08/27/us-usa-derivatives-banks- idUSKBN0GR1Z320140827.

**F.** **TeraExchange has been shut out of the CDS market as a direct result of the Dealer Defendants' conspiracy.**

127.     Faced with Dealer Defendants' unyielding boycott, TeraExchange has been shut out of the CDS market. Despite years of development and millions of dollars in investment capital, no further trading has occurred on TeraExchange following its launch on June 13, 2014. Had it been allowed to proceed, Tera would have earned a transaction fee on each trade executed and was positioned to earn very substantial transaction fees on CDS as the only anonymous, all-to-all CLOB platform for CDS.

128.     But for Defendants' anticompetitive acts, the CDS market would have gravitated to and generated immense profits for TeraExchange, which stood ready, willing, and able to onboard customers and execute transactions. The numerous non-traditional liquidity providers that committed to using TeraExchange like the members of the FIA Principal Traders Group would have utilized the platform to execute their CDS transactions were it not for the Dealer Defendants' conspiracy. Using TeraExchange would cost them less per transaction than trading directly with the Dealer Defendants. TeraExchange was ready to launch its CDS platform and inject greater price competition into the CDS market, resulting in lower CDS prices for consumers. Once trading on TeraExchange's platform began, other market participants would have joined the platform to take advantage of tighter bid/ask spreads and ease of execution available on an all-to-all order book.

129.     If the Dealer Defendants had not jointly boycotted Plaintiffs, there would have been a rapid migration of CDS onto TeraExchange. The Dealer Defendants have also successfully deterred any new exchanges or SEFs from entering the market to offer anonymous all-to-all trading to the buy-side.

## TOLLING AND FRAUDULENT CONCEALMENT

130.    The statute of limitations relating to the claims for relief alleged herein (*see* ¶¶ 159-83) were tolled because of fraudulent concealment. The Dealer Defendants' conspiracy to boycott TeraExchange was self-concealing by its very nature and they took affirmative steps to conceal their conspiracy from TeraExchange and the CDS market. Defendants communicated regarding their conspiracy in secret via telephone, email, instant messaging, and Bloomberg messaging. Plaintiffs had no way to access such communications.

131.    The Dealer Defendants' boycott of TeraExchange was, by necessity, secretive: the boycotts would have been rendered ineffective, and likely broken down, if their existence was made public.

132.    As a result of the self-concealing nature of the Defendants' collusive scheme, Plaintiffs did not discover and could not have discovered through the exercise of reasonable due diligence that they were injured by Defendants' conspiracy to boycott TeraExchange until at the earliest on June 13, 2014.

133.    In addition, Defendants repeatedly made false and misleading statements about the reasons for their collusive actions, in a purposeful effort to cause the public to believe that there were legitimate reasons for the lack of CDS market evolution, and they represented that their actions were beneficial to the market. Because of Defendants' affirmative efforts to mislead, Plaintiffs' continuing ignorance as to Defendants' conspiracy was not a result of a lack of due diligence.

134.    Defendants' success in hiding their collusion was facilitated by their tremendous clout in the financial markets, above and beyond the CDS market. Market participants are acutely aware that they cannot afford to make enemies of the Dealer Defendants, and there is a

great fear of retaliation. Market participants are well aware that, even if they were to make tentative suggestions that the Dealer Defendants might be engaging in anticompetitive behavior, such suggestions could be met with retaliation that could cause severe financial harm.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act

135.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

136.    As alleged above, Defendants and their co-conspirators entered into and engaged in a horizontal contract, combination, or conspiracy in restraint of trade to jointly boycott TeraExchange in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, moreover, an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

137.    Defendants and their co-conspirators' contract, combination, agreement, understanding, or concerted action was without procompetitive justification and occurred within the flow of, and substantially affected, interstate commerce.

138.    Defendants and their co-conspirators' conduct in boycotting TeraExchange cannot be plausibly justified as being intended to enhance overall market efficiency. Among other things, Defendants' conduct led to preventing all-to-all anonymous CLOB trading for CDS in the market, causing CDS customers to pay substantially wider bid/ask spreads on CDS than they would trading on an anonymous, all-to-all CLOB like TeraExchange.

139.    As a direct and proximate result of Defendants' scheme and concrete acts undertaken in furtherance thereof, TeraExchange has been injured and financially damaged in its respective business and property, including by having lost capital, market share, profits and goodwill, by incurring substantial and unnecessary expenses, and by being seriously weakened, and threatened with elimination, in amounts that are presently undetermined. Plaintiffs' damages are directly attributable to Defendants' illegal boycott of Plaintiffs' business. Plaintiffs' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## SECOND CLAIM FOR RELIEF

### Violation of the Donnelly Act
### New York General Business Law § 340, *et. seq.*

140.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

141.    Defendants' combination, conspiracy and arrangements alleged above, violate the Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*

142.    As alleged above, Defendants and their co-conspirators entered into and engaged in a horizontal contract, combination, or conspiracy in restraint of trade to jointly boycott TeraExchange and prevent all-to-all anonymous trading of CDS, resulting in higher bid/ask spreads in the Relevant Market.

143.    The Dealer Defendants dominate CDS trading. The Dealer Defendants' domination of CDS trading is reflected in their power over price, as demonstrated by their ability to maintain grossly inflated bid/ask spreads that bear no rational relationship to cost and to sustain those supracompetitive bid/ask spreads over a long period of time.

144.     To the extent a relevant market needs to be identified in this action, there is a distinct financial market for the purchase and sale of CDS in the United States.

145.     CDS are a unique financial product and those in the financial industry perceive them to be such. The market for the purchase and sale of CDS in the United States is treated as a distinct financial market by market participants, government actors, and in economic literature.

146.     Other derivative or credit products are not substitutable for CDS. The rapid rise in CDS volume following their inception in the mid-1990s demonstrates that investors turned to CDS to secure the unique and critical function of credit protection. CDS serve a unique role in the financial markets in a number of ways. For purchasers of credit protection, CDS are a unique financial product because, unlike the purchase of traditional credit insurance, purchasing protection under a CDS does not require providing proof of loss to receive compensation in the case of credit loss.

147.     For investors interested in "shorting" a credit risk or speculating that a "reference entity" will experience a credit event, CDS allows them to make "naked shorts," that is, take a position without owning the underlying credit risk. There is no market substitute for such shorting and the shorting of CDS is not interchangeable with a short position in the underlying bond because of search costs and the risk of maintaining a "borrow" position in the bond. Due to these differences and many others, there is little cross-elasticity of demand between transactions involving CDS and transactions involving other financial products.

148.     The relevant geographic market is the United States. But the Dealer Defendants also dominate any more broadly defined geographic markets as well, including any global market.

149.     Each Dealer Defendant possesses a significant share of the CDS market, and they collectively dominate this market, including with regard to every component of it—single-name and index CDS, or purported variations of the market defined above. An all-to-all CDS exchange would increase competition in this market by enabling the purchase and sale of both domestic and foreign CDS by non-dealers located in the United States. Due to the Defendants' unlawful collusion, as alleged herein, transparent, all-to-all CLOB platforms like TeraExchange were excluded from the market.

150.     The market also has high barriers to entry, which facilitated the collusion that occurred, as alleged herein. The CDS market is structured in a way that makes it infeasible for potential entrants to become over-the-counter dealers. A potential over-the-counter dealer must generate enough trading volume to achieve economies of scale. A large trading volume not only aids the entrant in mitigating fixed costs of entry, but also helps dissipate the risk the dealer incurs on any given trade, through the effect of being positioned to more quickly lay off positions with other customers, and also through the effect of netting counterparty risk over many positions. The infeasibility of starting an over-the-counter CDS trading business, or lack of an ability to gain market share, is a major source of market power for the Dealer Defendants.

151.     Key Defendants reside and conduct significant business in New York, including Defendants Goldman Sachs, Merrill Lynch, Citi, and JPMorgan, among others, who are headquartered in New York. It is therefore appropriate to apply New York antitrust law because Defendants' illegal conspiracy, overt acts in furtherance thereof, and other anticompetitive conduct occurred in New York.

152.     Defendants and their co-conspirators' conduct in boycotting Plaintiffs cannot be plausibly justified as being intended to enhance overall market efficiency. Among other things,

Defendants' conduct leads to substantially wider bid/ask spreads than would occur through trading on an anonymous, all-to-all CLOB like TeraExchange.

153.    As a direct and proximate result of Defendants' scheme and concrete acts undertaken in furtherance thereof, TeraExchange has been injured and financially damaged in its respective business and property, including by having lost capital, market share, profits and goodwill, by incurring substantial and unnecessary expenses, and by being seriously weakened, and threatened with elimination, in amounts that are presently undetermined. Plaintiffs' damages are directly attributable to Defendants' illegal boycott of Plaintiffs' business. Plaintiffs' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

a.    Find Defendants jointly and severally liable for the damages incurred by Plaintiffs;

b.    Award Plaintiffs treble damages;

c.    Award reasonable attorneys' fees and costs;

d.    Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of this Complaint;

e.    Decree that Defendants and their co-conspirators have unlawfully conspired to boycott TeraExchange in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

f.    Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiffs;

g.      Decree that Defendants have tortuously interfered with Plaintiffs' prospective business relations with its customers;

h.      Permanently enjoin Defendants from continuing their unlawful conduct, which has blocked TeraExchange's access to, and prevented competition from entering, the CDS market;

i.      Grant any such other further relief to which Plaintiffs may be entitled and/or is necessary to correct the anticompetitive effects caused by the unlawful conduct of Defendants and as the Court deems just and/or equitable.

## <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury of all issues so triable.

Dated: January 30, 2020
      White Plains, New York                **LOWEY DANNENBERG, P.C.**

                             By: <u>/s/ *Vincent Briganti*</u>
                                Peter D. St. Phillip
                                Geoffrey M. Horn
                                Vincent Briganti
                                Christian P. Levis
                                44 South Broadway
                                White Plains, New York 10601
                                Tel.: (914) 997-0500
                                pstphillip@lowey.com
                                ghorn@lowey.com
                                vbriganti@lowey.com
                                clevis@lowey.com

                                *Counsel for Plaintiffs*