## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TERA GROUP, INC., TERA ADVANCED TECHNOLOGIES, LLC, and TERAEXCHANGE, LLC,<br><br>Plaintiffs,<br><br>-against-<br><br>CITIGROUP, INC., CITIBANK N.A., CITIGROUP GLOBAL MARKETS INC., CITIGROUP GLOBAL MARKETS LIMITED, BARCLAYS PLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., BNP PARIBAS, S.A., BNP PARIBAS SECURITIES CORP., CREDIT SUISSE AG, CREDIT SUISSE GROUP AG, CREDIT SUISSE SECURITIES (USA) LLC, CREDIT SUISSE INTERNATIONAL, JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, J.P. MORGAN SECURITIES PLC, and UBS SECURITIES LLC,<br><br>Defendants. | Docket No. 17-CV-4302 (RJS)<br><br>**ORAL ARGUMENT REQUESTED** |

## TERA GROUP PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................ii

INTRODUCTION.................................................................................................................1

ARGUMENT .....................................................................................................................4

I.     The Amended Complaint Alleges a Plausible Conspiracy Against All Six Defendants. ...........4

II.    Tera Group Plaintiffs Plead Parallel Conduct That is Nearly Identical to What this Court Found Adequate to Allege an Antitrust Conspiracy. ......................................................5

III.   The Amended Complaint Pleads the Exact Same Plus Factors That this Court Already Found Sufficient..........................................................................................................10

IV.   The Amended Complaint Does Not Impermissibly Group Plead; It Plausibly Connects Each Remaining Defendant to the Group Boycott. ..............................................................12

        A.    Barclays....................................................................................................13

        B.    Credit Suisse.............................................................................................13

        C.    JPMorgan .................................................................................................14

        D.    BNP Paribas .............................................................................................15

        E.    UBS ........................................................................................................15

        F.    Citi .........................................................................................................16

CONCLUSION..................................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                           **Page(s)**

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) ...........................................................................................5

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................................4

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ...............................................................................4, 13, 15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................................................................4

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
   996 F.2d 537 (2d Cir. 1993) ..........................................................................................4

*Christen Inc. v. BNS Indus., Inc.*,
   517 F. Supp. 521 (S.D.N.Y. 1981) ..............................................................................17

*Eagle Lion Films v. Loew's Inc.*,
   219 F.2d 196 (2d Cir. 1955) ........................................................................................17

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
   700 F. Supp. 2d 378 (S.D.N.Y. 2010) ...................................................................12, 13

*In re Interest Rate Swaps Antitrust Litigation*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017) ..............................................................10, 12, 13

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
   359 U.S. 207 (1959) ......................................................................................................4

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) ....................................................................................5, 10

*Minifield v. City of Winchester*,
   No. 5:17CV43, 2020 WL 1032352 (W.D. Va. Mar. 3, 2020) ......................................17

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010) ..........................................................................................5

*Tera Grp., Inc. v. Citigroup, Inc.*,
   No. 17-CV-4302 (RJS), 2019 WL 3457242 (S.D.N.Y. July 30, 2019) ..................*passim*

*Trugman-Nash, Inc. v. New Zealand Dairy Bd.*,
   942 F. Supp. 905 (S.D.N.Y. 1996) ..............................................................................17

*Walker Distrib. Co. v. Lucky Lager Brewing Co.*,
323 F.2d 1 (9th Cir. 1963) ............................................................................................................17

## INTRODUCTION

On July 30, 2019, this Court denied Defendants'[1] motion to dismiss Tera Group Plaintiffs'[2] original Complaint, sustaining a boycott conspiracy nearly identical to one alleged in the Amended Complaint.  Almost immediately thereafter, Defendants and their counsel – all of whom have participated in nearly two years of discovery in *In re Interest Rate Swaps Antitrust Litigation*, 16-md-2704 (PAE) ("*In re IRS*") – began to relentlessly threaten Rule 11 sanctions based on their interpretation of selective bits of evidence from the *In re IRS* record that counsel here did not create and could not yet review in context.  Notwithstanding Defendants' tactics, Tera Group Plaintiffs' counsel agreed to review Defendants' *selective* evidence on an expedited basis, and meticulously sorted through each of Defendants' myriad demands for deletions from the Complaint.  As a result of this process, and to avoid burdening the Court with undue Rule 11 practice on issues that are not dispositive of Tera Group Plaintiffs' claims, Tera Group Plaintiffs agreed to amend a select few allegations that, at the time, purportedly were not precisely the same as certain facts in the cited record – before Tera Group Plaintiffs reviewed the entire record from *In re IRS* or took an ounce of their own discovery.

However, and fatal to Defendants' motion, these amendments do not change the Court's prior ruling that "viewed holistically, the Complaint adequately pleads parallel conduct that makes the inference of a conspiracy among the six remaining Defendants plausible."  *See Tera Grp., Inc. v. Citigroup, Inc.*, No. 17-CV-4302 (RJS), 2019 WL 3457242, at *21 (S.D.N.Y. July 30, 2019).  At most, the amendments to the "Audit" and "Trojan Horse" allegations, and the withdrawal of the "Threat" allegation alter the precise way that these isolated aspects of the broader conspiracy initially were alleged but not the fact that the conspiracy allegations remain plausibly pled.

---

[1]  The six remaining Defendants are Barclays, BNP Paribas, Citi, Credit Suisse, JPMorgan, and UBS.

[2]  The Tera Group Plaintiffs are Tera Group, Inc., Tera Advanced Technologies, LLC, and TeraExchange, LLC.

First, Tera Group Plaintiffs allege the same types of conduct that the Court found persuasive in denying Defendants' first motion to dismiss. Specifically, and contrary to Defendants' mischaracterization, Tera Group Plaintiffs allege that Defendants engaged in a coordinated response to the initial trade on Tera's CDS platform, (*see* Am. Compl. ¶¶ 73-77), and that the response was "ultimately fatal to [Tera Group Plaintiffs'] CDS business," (Am. Compl. ¶ 73). Tera Group Plaintiffs' Amended Complaint alleges that after the first trade on Tera's CDS platform, no defendant cleared trades on TeraExchange and multiple defendants cited similar amorphous technical issues and the need for additional know-your-client ("KYC") reviews and/or rulebook audits as pretextual reasons to boycott TeraExchange. As this Court already held, these allegations "lend *further* support to the inference that Defendants' actions transcend mere coincidence." *See Tera Grp.*, 2019 WL 3457242, at *18 (emphasis added); *see, e.g., id.* at *16 (citing, for example, Defendants' "[p]arallel refusal to trade on TeraExchange" as one of many instances of parallel conduct).

Similarly, Tera Group Plaintiffs' amendment to the "Trojan Horse" allegation – removing a specific reference to one individual from Barclays – does not materially change the allegations, or the Court's analysis that Defendants "used similar language in describing Tera as a Trojan Horse." *Tera Grp.*, 2019 WL 3457242, at *18. Though mildly edited from their original form, these allegations lead to the same conclusion that this Court has reached – Tera Group Plaintiffs have adequately alleged Defendants engaged in parallel conduct to boycott TeraExchange.

Despite this, Defendants now believe that they can declare victory – before discovery – because selective excerpts from the record in *In re IRS* show that boycott scheme was carried out in a way that was immaterially different from what was alleged in the original Complaint.  Defendants' focus on these insignificant amendments highlights their desire to avoid the scores of other allegations that the Court found persuasive in sustaining Tera Group Plaintiffs' group boycott claims, and a discovery record that when developed will only bolster Tera Group Plaintiffs' claims.

2

In holding that the Complaint adequately pled parallel conduct of a conspiracy among the six remaining Defendants, the Court detailed eight separate forms of parallel conduct, each of which continues to be alleged in the Amended Complaint. *See Tera Grp.*, 2019 WL 3457242, at *18. The vast majority of specific allegations thereof were not altered, or were altered in ways that are wholly immaterial to the Court's analysis. *Compare: Tera Grp.*, No. 17 CIV. 4302 (RJS), 2019 WL 3457242, at *16 *with* Am. Compl. ¶¶ 78-81, 96 (***alleging parallel refusal to trade on Tera***); *Tera Grp.*, 2019 WL 3457242, at *17 *with* Am. Compl. ¶¶ 73-75, 96 (***alleging parallel action towards Tera in response to the first trade***); *Tera Grp.*, 2019 WL 3457242, at *17 *with* Am. Compl. ¶¶ 65, 82-96 (***alleging parallel withholding of clearing services by Defendants' FCMs***); *Tera Grp.*, 2019 WL 3457242, at *17 *with* Am. Compl. ¶¶ 15, 82, 93, 111 (***alleging similar clearing fee differentials***); *Tera Grp.*, 2019 WL 3457242, at *17 *with* Am. Compl. ¶ 103 (***alleging common excuses and vocabulary***); *Tera Grp.*, 2019 WL 3457242, at *17 *with* Am. Compl. ¶¶ 14, 95, 123-24 (***alleging similar exertion of pressure on customers and inter dealer SEFs***); *Tera Grp.*, 2019 WL 3457242, at *17 *with* Am. Compl. ¶¶ 97-98, 100, 125-26 (***alleging similar treatment of IDBs***); and *Tera Grp.*, 2019 WL 3457242, at *18 *with* Am. Compl. ¶¶ 104, 106, 111-15 (***alleging parallel adherence to name give-up***)).

Likewise, the amendments do not change the fact that the allegations in the Amended Complaint remain sufficient to establish a link between each of the remaining defendants and the conspiracy. *See Tera Grp.*, 2019 WL 3457242, at *14; Am. Compl. ¶¶ 88 nn. 24-25, 103 (***Barclays***); *Tera Grp.*, 2019 WL 3457242, at *14; Am. Compl. ¶¶ 79-80, 87, 88 nn. 24-25, 121 (***Credit Suisse***); *Tera Grp.*, 2019 WL 3457242, at *15; Am. Compl. ¶¶ 87 n. 23, 88 nn. 24-25, 90, 100-02, 121 (***JPMorgan***); *Tera Grp.*, 2019 WL 3457242, at *15; Am. Compl. ¶¶ 73, 75 (***BNP Paribas***); *Tera Grp.*, 2019 WL 3457242, at *16; Am. Compl. ¶¶ 87 n. 23, 88 nn. 24-25, 75, 79-80 (***UBS***); *and Tera Grp.*, 2019 WL 3457242, at *16; Am. Compl. ¶¶ 87 n. 23, 88 nn. 24-25, 93, 98 (***Citi***).

In sum, Defendants have used the voluminous record in *In re IRS* to take their best shot at Tera Group Plaintiffs' claims, and for a second time, they have missed the mark. Nothing about the Amended Complaint should change this Court July 30, 2019 decision and the Court should deny Defendants' latest attempt to avoid further discovery, which no doubt bolsters Tera Group Plaintiffs' claims. *See Tera Grp.*, 2019 WL 3457242, at *18.

## ARGUMENT

## I.    The Amended Complaint Alleges a Plausible Conspiracy Against All Six Defendants.

The Amended Complaint states a plausible claim against the remaining six Defendants for a violation of Section 1 of the Sherman Act. *See Tera Grp.*, 2019 WL 3457242, at *16-21.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "[A] court must accept as true all of the [factual] allegations contained in a complaint" and engage in a "context-specific" inquiry based on "its judicial experience and common sense" to determine whether a complaint is plausible.  *Iqbal*, 556 U.S. at 678-79.  It must also draw inferences in the plaintiff's favor.  *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

To state a Section 1 Sherman Act claim, Plaintiffs must allege facts showing (1) "a combination or some form of concerted action between at least two legally distinct economic entities," and (2) "that the agreement constituted an unreasonable restraint of trade either per se or under the rule of reason." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993).  A group boycott or concerted refusal to deal is *per se* illegal under the Sherman Act.  *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959).  "[T]he challenged

4

conduct [must] stem from . . . an agreement, tacit or express," as opposed to an "independent decision." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (alteration and citation omitted).

Direct evidence is not required to establish a Sherman Act conspiracy; circumstantial evidence in the form of parallel conduct and plus factors will suffice to suggest a conspiracy. *Tera Grp.*, 2019 WL 3457242, at *8; *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183-84 (2d Cir. 2012) *cert. denied sub nom. Curtis Circulation Co. v. Anderson News, L.L.C.*, 568 U.S. 1087 (2013)). The non-exhaustive and non-exclusive list of plus factors may include:  (1) "a common motive to conspire"; (2) "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators"; and (3) "evidence of a high level of interfirm communications." *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).

Even so, at the motion to dismiss stage, Plaintiffs "need not show that [their] allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action." *Anderson News*, 680 F.3d at 184.  Additionally, a court may not, on a motion to dismiss, weigh differing inferences that can be drawn from the allegations; it must sustain "a complaint that states a plausible version of the events" even if it "finds a different version more plausible." *Id.* at 184-85; *Tera Grp.*, No. 17-CV-4302 (RJS), 2019 WL 3457242, at *18 ("The Court is not at liberty, on a motion to dismiss, to discard Plaintiffs' version of events in favor of the narrative advanced by Defendants simply because the Defendants' version is 'fully consistent' with the alleged facts.").

## II.     Tera Group Plaintiffs Plead Parallel Conduct That is the Nearly Identical to What this Court Found Adequate to Allege an Antitrust Conspiracy.

The parallel conduct alleged in the Amended Complaint remains the same as that which this Court relied on in denying Defendants' last motion to dismiss. *Tera Grp.*, 2019 WL 3457242, at *18, 19.  This should come as no surprise, as Tera Group Plaintiffs' allegations remain mostly unchanged.

The Court relied on eight specific categories of parallel conduct, and each remains well pled in the Amended Complaint.

Defendants misleadingly state that the "Audit" and "Trojan Horse" allegations have been removed from the Amended Complaint, and they contend that such purported removal is fatal to finding that Tera Group Plaintiffs' adequately plead parallel conduct.[3] (*See* Defs.' Mov. Br. 19.) First, Tera Group Plaintiffs have merely revised, and not withdrawn, the "Audit" and "Threat" allegations.  Second, and contrary to Defendants' arguments, Tera Group Plaintiffs' revisions to a few allegations should not lead the Court to abandon its previous decision, and suddenly view Tera Group Plaintiffs' allegations of parallel conduct as unilateral action.  (*See id.*)

While Defendants repeatedly urge the Court to re-evaluate the categories of parallel conduct identified in the July 30, 2019 opinion in isolation and with a renewed view towards unilateral action, this Court has already held that the alleged "conduct does not stand alone" and thus should not be "considered in isolation." *Tera Grp.*, 2019 WL 3457242, at *18 *compare with* Defs.' Mov. Br. 20-21 (arguing parallel refusal to deal allegations should be viewed in isolation) *and* Defs.' Mov. Br. 21-22 (arguing allegations of parallel treatment of IDBs should be viewed in isolation).  Defendants' new arguments do not change the fact that the Court has already adjudicated these issues.

First, the allegations in the Amended Complaint still clearly evidence "parallel action towards Tera in response to its first swap trade." *See Tera Grp.*, 2019 WL 3457242, at *17.  The Amended Complaint alleges: On June 13, 2014, TeraExchange executed the first ever anonymous swap trade on any all-to-all CLOB platform, with BNP Paribas and JPMorgan acting as FCMs for the

---

[3]  Plaintiffs have withdrawn what Defendants describe as the "Threat Allegation." However, the Amended Complaint still alleges that all remaining Defendants, including BNP Paribas, threatened buy-side customers, IDBs, and SEFs with the withdrawal of "key banking services and make it impossible to trade other derivative products as well" if they used TeraExchange. (*See, e.g.,* Am. Compl. ¶ 119-26.)  Additionally, the Court relied, in part, on the "Threat Allegation" in analyzing three types of parallel conduct which, as discussed below remain adequately pled without the "Threat Allegation."

transacting parties.  (Am. Compl. ¶ 72.)  However, as soon as the next day, BNP Paribas – to the shock of its own employees – advised Tera that it would no longer clear trades on TeraExchange until it conducted a KYC review, which included an audit of Tera's Rulebook (which was already reviewed by the CFTC).  (Am. Compl. ¶¶ 59, 73.)  BNP Paribas also told Chimera/Annaly to hold off on executing more trades on TeraExchange, citing amorphous "operational issues."  (Am. Compl. ¶ 73.)  JPMorgan followed suit, refusing to clear any trades on TeraExchange following the first trade, citing "amorphous technical issues, including the KYC review and/or an audit of Tera's rulebook," while also prohibiting "its brokers from using TeraExchange to execute the bank's trades."  (Am. Compl. ¶ 74.)  UBS also followed suit the next business day, confirming that it would not cooperate with TeraExchange and not trade on the platform, a wholly inconsistent departure from previous discussions it had Tera, like the other Defendants who also previously expressed their interest in trading on TeraExchange.  (Am. Compl. ¶¶ 75-76, 78.)  Citi, like the other Defendants, also made clear that it would reverse course and refuse to trade or clear trades on TeraExchange.  (Am. Compl. ¶ 76.)  Consistent with the boycott conspiracy and the uniform reversal in course by Defendants, none of the Defendants cleared any trades on TeraExchange after the first trade, despite having previously expressing interest in doing so and despite the risk-free and fee-friendly venture it would have been for Defendants.  (Am. Compl. ¶ 77-78.)

Similarly, the Amended Complaint contains detailed allegations of each of the seven other types of parallel conduct that the Court relied on:

### Parallel Refusal to Trade on Tera

Defendants initially claimed an interest in trading on TeraExchange, but all ultimately refused to trade on TeraExchange and refused to direct any of their CDS business to Tera so as to starve the platform of liquidity.  (*See* Am. Compl. ¶¶ 78-81, 96.)

7

### Common Excuses and Vocabulary

Following the first trade, Defendants cited amorphous reasons for refusing to clear trades on TeraExchange, such as purportedly having to conduct a KYC review of Tera or audit its rulebook (which was already reviewed by the CFTC), even though such assertions were wholly inconsistent with previous discussions Defendants had with Tera and the fact that BNP Paribas already cleared a trade on TeraExchange. (*See* Am. Compl. ¶¶ 59, 73-75, 96.)  Similarly, Defendants are still alleged to have collectively regarded TeraExchange as a "Trojan Horse." (*See* Am. Compl. ¶ 103.)  Finally, Defendants dragged Tera along by repeatedly requesting core documents, like End User License Agreements ("EULA"), but never did anything with the material and never executed an EULA.[4] (*See* Am. Compl. ¶ 79-80.)

### Parallel Withholding of Clearing Services by Defendants' FCMs; Similar Clearing Fee Differentials

Defendants collectively used their position of control over the CDS clearing business to further their boycott by using their internal clearing divisions (which were in constant communication with each other) to (1) block buy-side customers who used TeraExchange from using their clearing platforms, and (2) quote TeraExchange customers obscenely high clearing fees relative to similar trades by non-TeraExchange customers. (*See* Am. Compl. ¶¶ 82, 83-84, 86, 87-88, 90, 93, 94-96.)  Through their collective refusal to engage in the pre-trade credit check for their customers – which is required to allow a customer to trade on a platform – Defendants effectively blocked all prospective CDS trades on TeraExchange. (*See* Am. Compl. ¶¶ 84-85.)

---

[4]  Defendants argue that the allegations regarding the refusals to execute EULAs are vague (*See* Defs.' Mov. Br. 23-24.), but again do not explain why this Court should depart from its previous holding on this discrete factual allegation as it applies to the parallel conduct category of common excuses and vocabulary, *Tera Grp.*, 2019 WL 3457242, at *17.

### *Similar Exertion of Pressure on Customers and Inter Dealer SEFs*

Defendants took material steps to prevent any further success for Tera Group Plaintiffs by dissuading IDBs, banks, and large buy-side CDS trading firms from using TeraExchange.  (*See* Am. Compl. ¶¶ 11-14, 72, 73-77, 97-103.)  Defendants collectively penalized those who attempted to introduce or use anonymous trading; interdealer SEFs received heated phone calls and other threats in an effort to prevent them from introducing trade anonymity to the buy-side, while buy-side customers were put in the "penalty box," which meant that they would be effectively cut off from the ability to trade any derivatives.  (*See* Am. Compl. ¶¶ 119-25.)  Defendants also used their position of power to threaten buy-side customers with the withdrawal of "key banking services and make it impossible to trade other derivative products as well."  (*See* Am. Compl. ¶ 123.)

### *Similar Treatment of IDBs*

Despite Tera having signed up numerous international IDBs to clear swap trades on TeraExchange, Defendants threatened to boycott IDBs if they participated in anonymous all-to-all trading like TeraExchange.  (*See* Am. Compl. ¶¶ 125-26.)  In order to execute trades on TeraExchange, the IDBs needed Defendants' consent.  (*See* Am. Compl. ¶ 121.)  Defendants collectively delayed and ultimately refused to give their consent, citing amorphous, illegitimate reasons like the fact that they had not signed onto Tera's rulebook.  (*See* Am. Compl. ¶¶ 97-101.)

### *Parallel Adherence to Name Give-Up*

Lastly, Defendants collectively maintained a two-tiered market structure by insisting on the practice of "name give-up," or post-trade name disclosure, to maintain a record of those conducting trades on all-to-all SEFs, which was completely unnecessary post-Dodd-Frank and promoted information asymmetry in favor of Defendants and against buy-side customers who were forced to reveal their trading positions and strategies.  (*See* Am. Compl. ¶¶ 104-17.)  One way Defendants ensured effective implementation of this plan was to require IDBs to use MarkitWIRE, which was a

cumbersome and unnecessary service that offered counterparties the option of canceling the transaction after revealing the identity of the counterparty, thereby removing any safety of anonymity.  (*See* Am. Compl. ¶¶ 111-15.)

The Court should rely on all these allegations of parallel conduct – almost exactly as it did before – to conclude that Tera has adequately pled parallel conduct, which when combined with sufficient plus factors, would withstand a motion to dismiss.  *See Tera Grp.*, 2019 WL 3457242, at *18-19; *see also In re IRS*, 261 F. Supp. 3d at 456-76 (finding same parallel conduct allegations adequately pled).[5]

### III.   The Amended Complaint Pleads the Exact Same Plus Factors That this Court Already Found Sufficient.

The Amended Complaint keeps intact all the plus factors alleged in the Complaint and upon which the Court relied.  Despite the numerous plus factors presented in both the Complaint and now the Amended Complaint, the Court needs only one to find a plausible conspiracy, when coupled with parallel conduct.  *See Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013) ("Plaintiffs relying on parallel conduct must allege facts that, if true, would establish at least one 'plus factor'" (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010)).

First, as to **common motive**, the Court relied on numerous allegations that are unchanged in the Amended Complaint. Nonetheless, Defendants double-down on the same arguments the Court has already rejected – that the amended common motive allegations rely solely on

---

[5] Even discounting for instances where the parallel conduct does not specifically identify a particular defendant, the conduct taken together and "viewed holistically" provides a plausible "inference of a conspiracy among the six remaining Defendants."  *Tera Grp.*, 2019 WL 3457242, at *18.

Defendants' refraining from trading or clearing on TeraExchange.[6]  (*See* Defs.' Mov. Br. 26-27.)
This is simply not true.  The Court's plus-factor analysis did not rely, in any material way, on the
amended allegations from the original Complaint.  *See Tera Grp.*, 2019 WL 3457242, at *19-20.
Undoubtedly, the Amended Complaint has established that Defendants had a common motive to
maintain the market structure they had instituted that required "maximal use of non-anonymous
RFQ trading with the buy-side." *See Tera Grp.*, No. 17-CV-4302 (RJS), 2019 WL 3457242, at *19;
(Am. Compl. ¶¶ 4, 12, 52-57, 60-67, 72, 106-07, 117, 119).

      Similarly, Defendants try to convince the Court that the amended allegations were the only
interfirm communication allegations in the Complaint.  (*See* Defs.' Mov. Br. 27.)  However, the
Amended Complaint, like the original Complaint, is rife with allegations of **interfirm
communications**, that "in combination with allegations of common language and techniques used
by Defendants in carrying out the boycott, contribute to the plausibility of the inference that the
alleged parallel conduct flowed from a [conspiracy]."  *See Tera Grp.*, No. 17-CV-4302 (RJS), 2019 WL
3457242, at *20.  For example, the Amended Complaint continues to allege that "Dealer
Defendants' FCMs were able to coordinate their activities because, *inter alia*, their clearing operations
communicate regularly with each other," (Am. Compl. ¶ 90), *see Tera Grp.*, 2019 WL 3457242, at *20
n.13; that the remaining Defendants "regarded TeraExchange's platform as a 'Trojan Horse.'" (Am.
Compl. ¶ 103); and Defendants' holding of overlapping roles in institutions critical to the CDS
market, including their joint ownership and status as clearing members of ICE Clear (Am. Comp. ¶
87), as well as their roles as clearing members at CME and LCH.Clearnet (Am. Comp. ¶ 88)."  *Tera
Grp.*, 2019 WL 3457242, at *20 (footnote omitted).  As a result, Defendants' arguments are
unavailing and the Court's conclusion should remain unchanged.

---

[6]  Defendants also argue that the size of the conspiracy is supposedly now reduced to the extent that
the remaining Defendants do not have dominant market power to achieve their common goal.  (*See*
Defs.' Mov. Br. 27.)  This argument is addressed *infra* at footnote 8.

Lastly, the Tera Group Plaintiffs' allegations regarding Defendants' collective self-interest are the same. The Amended Complaint, like the original Complaint, alleges that Defendants' FCMs would have, absent collusion, followed client demand and cleared CDS trades on TeraExchange (or at least present legitimate reasons for refusing to do so), while also earning a fee. (Am. Compl. ¶¶ 81, 86.) These allegations lend further support to the overall group boycott conspiracy. *Tera Grp.*, No. 17-CV-4302 (RJS), 2019 WL 3457242, at *20. [7]

## IV.    The Amended Complaint Does Not Impermissibly Group Plead; It Plausibly Connects Each Remaining Defendant to the Group Boycott.

In a "collective boycott" case, like this one, "it is natural that the [complaint] express some factual allegations collectively." *In re IRS*, 261 F. Supp. 3d 430, 478 (S.D.N.Y. 2017); *Tera Grp.*, 2019 WL 3457242, at *11 ("not all group allegations are improper." (citing *In re IRS*)). "While 'collective allegations about Dealer Defendants that lack allegations about a particular' Defendant should be 'discount[ed] as worthy of less weight' relative to detailed claims, they may nevertheless be taken into account, alongside more specific allegations, in determining whether Tera has pleaded a plausible Section 1 conspiracy." *Tera Grp.*, 2019 WL 3457242, at *11 (quoting *In re IRS*, 261 F. Supp. 3d at 474); *accord Hinds Cty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) ("A [Sherman Act] § 1 complaint must adequately allege the plausible involvement of each defendant and put defendants on notice of the claims against them, but it need not be detailed with overt acts by each defendant.").

This Court already "consider[ed] each remaining Defendant in turn to determine whether Tera has alleged sufficient facts to establish the requisite connection to the alleged conspiracy." *See Tera Grp.*, 2019 WL 3457242, at *12, 14-16. The Complaint allegations this Court relied on in

---

[7] Plaintiffs' opposition to Defendants' first motion to dismiss cited a total of ten plus factors, not all of which are recounted here for brevity. (*See* Pls.' Opp. Br. 21-25, ECF No. 116).

finding each of the remaining Defendants sufficiently connected to the group boycott remain intact in large part, and have not been materially altered in the Amended Complaint. Each remaining defendant is addressed separately.

### A. Barclays

Defendants' argument that the "Trojan Horse" allegation was the only connection between Barclays and the conspiracy is untrue. In addition to renewed, amended Trojan Horse allegation, Plaintiffs allege that Barclays was a clearing member of both LCH.Clearnet and CME, (Am. Compl. ¶¶ 88 nn. 24-25), the Amended Complaint continues to allege that Barclays was a part of the group of remaining Defendants who "uniformly took the position that they would not allow [IDBs] to execute trades on TeraExchange" and who "regarded TeraExchange's platform as a 'Trojan Horse,' (Am. Compl. ¶ 103). Drawing all inferences in favor of Plaintiffs, *ATSI Communications*, 493 F.3d at 98, these allegations, although slightly revised, sufficiently connect Barclays to the group boycott conspiracy, *see In re IRS*, 261 F. Supp. 3d at 474, 478; *Hinds Cty.*, 700 F. Supp. 2d at 394.

### B. Credit Suisse

The allegation against Credit Suisse remain almost entirely unchanged, as neither the removed nor revised sections of the "Threat," "Audit," or "Trojan Horse" allegations pertain to Credit Suisse. Nonetheless Defendants regurgitate the argument that the allegations against Credit Suisse are too vague and conclusory to connect it to the conspiracy – but they ignore that: (1) Credit Suisse partially owns ICE Clear and is a clearing member of LCH.Clearnet and CME; (2) Credit Suisse executives placed "heated phone calls" to an interdealer SEF run by GFI Group in response to GFI's planned introduction of buy-side trade anonymity, which led to GFI "promptly revers[ing] course"; and (3) Credit Suisse repeatedly requested Tera revise its core documents as a precondition to routing customer orders to Tera, but Credit Suisse never executed an EULA with Tera even though Credit Suisse approved the revisions Tera made to its core documents. (Am. Compl. ¶¶ 79-

13

80, 87, 88 nn. 24-25, 121.)  Since none of these allegations have been revised, the Court's analysis should remain unchanged; Credit Suisse is "sufficiently link[ed] [] to the alleged conspiracy."  *Tera Grp.*, 2019 WL 3457242, at *14.

### C. *JPMorgan*

Tera Group Plaintiffs' allegations against JPMorgan remain "robust."  *Tera Grp.*, 2019 WL 3457242, at *15.  Defendants' argument that the amendments significantly change the depth of the allegations against JPMorgan is simply not true.

JPMorgan, along with Citi, controls more than 25% of all CDS dealing in the U.S. and is a partial owner of ICE Clear and a clearing member of LCH.Clearnet and CME.  (Am. Compl. ¶¶ 3, 87 n.23, 88 n.24-25.)  The Amended Complaint alleges that "JPMorgan . . . did not clear any trades on TeraExchange following th[e] first trade, citing amorphous technical issues, including the KYC review and/or an audit of Tera's rulebook," while also "prohibit[ing] its brokers from using TeraExchange to execute the bank's trades."  (Am. Compl. ¶ 74.)  Tera Group Plaintiffs also continue to allege that JPMorgan "inexplicably delay[ed] its approval for GMG" (an IDB who wanted to use TeraExchange), and that a JPMorgan executive cited the fact that JPMorgan did not sign Tera's Rulebook as the reason why GMG could not proceed with TeraExchange.  (Am. Compl. ¶ 100.)  The Amended Complaint also keeps in tact the detailed exchange relating to JPMorgan's stalling of approving GMG to execute a trade involving JPMorgan on TeraExchange, with GMG calling JPMorgan "the biggest issue at the time" in the whole ordeal.  (Am. Compl. ¶¶ 101-02.)  Lastly, like with Credit Suisse, the Amended Complaint continues to allege JPMorgan executives placed "heated phone calls" to an interdealer SEF run by GFI Group in response to GFI's planned introduction of buy-side trade anonymity, which led to GFI "promptly revers[ing] course."  (Am. Compl. ¶ 121.)  All these allegations, which the Court relied on the first go-around, suffice to tie JPMorgan to the conspiracy.  *Tera Grp.*, 2019 WL 3457242, at *15.

14

### D.  BNP Paribas

BNP tries to convince this Court that the revised Audit allegations unmoors its conduct from the conspiracy despite the fact that, as to BNP, the "Audit" allegation remains largely unchanged, and is but one of many allegations that tie it to the conspiracy. *See Tera Grp.*, 2019 WL 3457242, at *15.  The Amended Complaint alleges that on the next business day after the first trade on TeraExchange, BNP Paribas abruptly told Tera that it "would not clear any more trades on TeraExchange until it completed a [KYC] review of Tera, which included a review of Tera's Rulebook," something that was cleared by the CFTC and was presumably okay with BNP Paribas the day before when its FCM cleared a trade on TeraExchange.  (Am. Compl. ¶¶ 72-73.)  A BNP Paribas Vice President also told one of the counterparties to the first trade to abstain from trading on TeraExchange while BNP Paribas resolved amorphous "operational issues," (Am. Compl. ¶ 73), similar to what JPMorgan did, (Am. Compl. ¶ 74).  And since both JPMorgan and BNP Paribas were privy to the first trade and both abruptly ceased trading on TeraExchange, citing amorphous issues and demanding a KYC review and Rulebook audit, BNP Paribas, "[a]s with JP Morgan," there is enough allegations to allow the Court to infer, BNP Paribas is "link[ed] to the conspiracy."  *Tera Grp.*, 2019 WL 3457242, at *15; *ATSI Communications*, 493 F.3d at 98.

### E.  UBS

Similarly, the allegations in the Amended Complaint belie UBS's arguments that the removal of the "Audit" allegations means it does not remain tied to the conspiracy.  *Tera Grp.*, 2019 WL 3457242, at *16.

First, UBS remains a key player in the Defendants' reaction to the first trade.  (Am. Compl. ¶¶ 75, 77.)  Additionally, as with BNP Paribas, the Amended Complaint alleges UBS is a partial owner of ICE Clear and a clearing member of LCH.Clearnet and CME.  (Am. Compl. ¶¶ 87 n.23, 88 n.24-25.)  And it goes further and alleges that UBS repeatedly requested Tera revise its core

documents as a precondition to routing customer orders to Tera, but UBS never executed an EULA

with Tera even though UBS approved the revisions Tera made to its core documents.  (Am. Compl.

¶¶ 79-80.)  These allegations are sufficient, as they were for Credit Suisse, to tie UBS to the

conspiracy.  Though UBS argues that paragraph 75 alleges that UBS sent internal emails that do not

"reflect a UBS announcement not to 'cooperate' with Tera because of the June 13 trade," these

arguments amount to a nothing more than a factual dispute not appropriate for a motion to dismiss.

*See Tera Grp.*, No. 17-CV-4302 (RJS), 2019 WL 3457242, at *18 ("The Court therefore will not

resolve Defendants' competing interpretations of emails and other documents at this stage.").

### F.  Citi

Lastly, the Amended Complaint sufficiently connects Citi to the conspiracy.  It alleges that

Citi, along with JPMorgan, controls more than 25% of all CDS dealing in the U.S. and is a partial

owner of ICE Clear and a clearing member of LCH.Clearnet and CME.  (Am. Compl. ¶¶ 3, 87 n.23,

88 n.24-25.)  The Amended Complaint also alleges that when ANZ Bank (one of the world's largest

banks who signed up to use TeraExchange) approached Citi about clearing its trades on

TeraExchange in April 2014, the head of clearing at Citi represented that Citi would charge

"excessively high clearing fees to trade on TeraExchange" but would otherwise clear the "trades for

free if they transacted with them directly via an RFQ protocol on Bloomberg or the Dealer

Defendant-owned Tradeweb."  (Am. Compl. ¶ 93.)  The Amended Complaint continues to also

allege that Citi refused to allow an IDB, OTCex, to use TeraExchange, citing Citi's refusal to

approve TeraExchange's Rulebook as the reason.  (Am. Compl. ¶ 98.)  To make matters worse,

when "OTCex pointed out that Citi did not need to join TeraExchange or sign onto its rulebook

(which had been previously reviewed by the CFTC), [Citi] responded by saying that [it]s refusal to

allow inter-dealer brokers to execute trades on TeraExchange was 'more of an internal policy rather

than a regulatory one,'" underscoring "that there was no valid basis for Citi's refusal."  (Am. Compl.

¶ 98).  All these allegations tie Citi to the conspiracy, and the Court's analysis from the first go-around should not be materially altered.

Next, Defendants ignore the Courts' opinion on its previous motion to dismiss by arguing that the Amended Complaint cannot state a claim against the remaining Defendants because they do not possess a dominant position in the market.  (*See* Defs.' Mov. Br. 16-17.)  But, this Court has already ruled, that the Complaint adequately pled "a conspiracy among the *six remaining Defendants*." *Tera Grp.*, No. 17-CV-4302 (RJS), 2019 WL 3457242, at *18 (emphasis added).[8]

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety and should sustain the Amended Complaint.[9]  The parties should now be directed to proceed with discovery.

---

[8] As the Court acknowledged in its ruling, the remaining defendants cannot escape an adequately pled conspiracy simply because some defendants were dismissed from the Complaint as part of its group pleading analysis.  *Accord Eagle Lion Films v. Loew's Inc.*, 219 F.2d 196, 199 (2d Cir. 1955) ("the fact that co-conspirators have not been named as parties does not at all prevent or aid the showing of their complicity"); *Walker Distrib. Co. v. Lucky Lager Brewing Co.*, 323 F.2d 1, 8 (9th Cir. 1963) ("A plaintiff need not sue all conspirators; he may choose to sue but one."); *Minifield v. City of Winchester*, No. 5:17CV43, 2020 WL 1032352, at *11 (W.D. Va. Mar. 3, 2020) ("There is no legal requirement that a conspiracy claim proceed against all named conspirators.") *Christen Inc. v. BNS Indus., Inc.*, 517 F. Supp. 521, 524 (S.D.N.Y. 1981) ("Defendant need not name the co-conspirators in its allegations as long as he identifies them with some particularity."); *Trugman-Nash, Inc. v. New Zealand Dairy Bd.*, 942 F. Supp. 905, 917 n.6 (S.D.N.Y. 1996) ("There is no requirement that a plaintiff name all co-conspirators as long as their existence is set forth in the complaint.").

[9]  Defendants filed this motion with the unilateral benefit of the discovery record from *In re IRS*. Plaintiffs believe that the discovery record here, once fully developed, will only bolster Plaintiffs' claims. As such, Plaintiff request an opportunity to amend the complaint should the court dismiss.

Dated:  May 4, 2020
        White Plains, New York

                                        **LOWEY DANNENBERG P.C.**

                                    By: /s/ Vincent Briganti
                                        Vincent Briganti
                                        Peter D. St. Phillip
                                        Johnathan Seredynski
                                        Amir Alimehri
                                        44 South Broadway, Suite 1100
                                        White Plains, New York 10601
                                        Tel.: (914) 997-0500
                                        vbriganti@lowey.com
                                        pstphillip@lowey.com
                                        jseredynski@lowey.com
                                        aalimehri@lowey.com

                                        *Counsel for Plaintiffs*