UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TERA GROUP, INC., *et al.*,

                        Plaintiffs,

        -v-

CITIGROUP, INC., *et al.*,

                        Defendants.

No. 17-cv-4302 (RJS)
MEMORANDUM & ORDER

RICHARD J. SULLIVAN, Circuit Judge:

        Plaintiffs Tera Group, Inc., Tera Advanced Technologies, LLC, and TeraExchange, LLC

(collectively, "Tera") allege that Defendants, six of the world's largest financial institutions,[1]

conspired to prevent Tera from entering the lucrative market for credit default swaps ("CDS"), in

violation of federal and state antitrust laws.  Before the Court is Defendants' joint motion to

dismiss Tera's Amended Complaint for failure to state a claim under Federal Rule of Civil

Procedure 12(b)(6).  (Doc. No. 173.)  For the reasons stated below, the motion is GRANTED as

to all Defendants.

---

[1] The Defendants include Citigroup, Inc.; Citibank N.A.; Citigroup Global Markets Inc.; Citigroup Global Markets Limited ("Citi"); Barclays PLC; Barclays Bank PLC; Barclays Capital Inc. ("Barclays"); BNP Paribas, S.A.; BNP Paribas Securities Corp. ("BNP"); Credit Suisse AG; Credit Suisse Group AG; Credit Suisse Securities (USA) LLC; Credit Suisse International ("Credit Suisse"); JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; J.P. Morgan Securities LLC; J.P. Morgan Securities PLC ("JP Morgan"); and UBS Securities LLC ("UBS").

## I. Background

### A. Facts[2]

A CDS is a financial instrument that "functions like a tradable insurance contract and derives its value from the risk associated with a specified 'credit event,' such as the chance that a certain company will default on a payment or have its credit rating downgraded."[3]  (Am. Compl. ¶ 2.)  There are two types of CDS – single-name CDS (i.e., a derivative based on a single debt instrument issued by one underlying reference entity, typically a corporation or government entity) and index CDS (i.e., a derivative based on a basket of underlying single-name reference entities).  (*Id.* ¶ 45.)  Defendants profit from creating and selling CDS contracts to buy-side customers – including mutual funds, hedge funds, and insurance companies.  (*Id.* ¶ 4.)

Historically, buy-side customers were forced to use a request-for-quote ("RFQ") protocol, which compelled them to contact a CDS dealer directly, "identify themselves, and specify the terms of the CDS they wanted to purchase."  (*Id.* ¶¶ 5–6.)  This process prevented pricing information from reaching the public, a feature Defendants allegedly exploited by quoting "grossly inflated bid/ask spreads" to their customers.  (*Id.* ¶ 6 (internal quotation marks omitted).)  Defendants, meanwhile, traded CDS among themselves using "anonymous inter-dealer platforms, where they ha[d] exclusive access to the price at which CDS [was] trading."  (*Id.* ¶ 5.)

In the wake of the 2008 financial crisis, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111–203, 124 Stat. 1376

---

[2] As the Court previously has recounted the facts in this case in some detail, *Tera Grp., Inc. v. Citigroup, Inc.*, No. 17-cv-4302 (RJS), 2019 WL 3457242, *2–7 (S.D.N.Y. July 30, 2019), it will assume the parties' familiarity with its prior order and set forth here only those facts necessary to explain its decision with respect to the pending motion.

[3] The following facts are taken from the Amended Complaint, which was filed on January 30, 2020, and are presumed to be true at this stage of the proceedings.  (Doc. No. 167 ("Amended Complaint" or "Am. Compl.").)  In ruling on Defendants' motion, the Court has also considered Defendants' memorandum of law (Doc. No. 174 ("Mem.")), Tera's opposition (Doc. No. 177 ("Opp'n")), Defendants' reply (Doc. No. 178 ("Reply")), Tera's notice of supplemental authority (Doc. No. 181), and Defendants' response to Tera's notice of supplemental authority (Doc. No. 182).

(2010), to promote financial stability in the nation's financial markets. (*Id.* ¶ 43.) Title VII of Dodd-Frank divides regulatory authority over CDS between the Securities and Exchange Commission ("SEC"), which regulates single-name CDS, and the Commodity Futures Trading Commission ("CFTC"), which regulates index CDS. (*Id.* ¶¶ 45–46); *see also* 15 U.S.C. § 8302(a).

Dodd-Frank authorized the SEC and CFTC to require swap transactions to occur under a central-clearing model. (Am. Compl. ¶ 50); *see also* 15 U.S.C. § 78c-3(a)(1), (b); 7 U.S.C. § 2(h)(2). Before Dodd-Frank, parties to a swap trade faced each other directly, meaning they assumed the full risk of loss if their counterparty defaulted. (Am. Compl. ¶ 50.) Under a central-clearing model, a Derivatives Clearing Organization ("DCO") acts as a counterparty to both sides of the trade, serving as an intermediary between the two parties and a guarantor for each counterparty. (*Id.*) If a party to the trade were to default on its obligation under the CDS, the DCO, as guarantor, would still be contractually obligated to perform under the contract.[4] (*Id.*)

Dodd-Frank also authorized the SEC and CFTC to require that CDS subject to the clearing requirement be traded on a swap execution facility ("SEF"). *See* 15 U.S.C. § 78c-3(h); 7 U.S.C. § 2(h)(8). An SEF is "a trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants." 7 U.S.C. § 1a(50). As of the filing of the Amended Complaint, the SEC had not required that single-name CDS be traded on SEFs (Am. Compl. ¶ 47), while the CFTC had issued an SEF execution mandate for index CDS on February 26, 2014 (*id.* ¶ 46). Trades can be executed on an SEF through (1) an order book or (2) an RFQ-based system that operates in conjunction with an order book. *See* 17 C.F.R. § 37.9(a)(2). When trades are executed through an order book, "offers to buy and sell are

---

[4] In the United States, clearing operates through an "agency model," whereby the risk of default is not carried by the clearinghouse itself, but rather its "clearing members" – typically large banks with enough collateral to guarantee performance on a trade. (*Id.* ¶ 83.)

entered into a matching system and matched either manually or automatically by algorithm." *In re Int. Rate Swaps Antitrust Litig.* (*In re IRS*), 261 F. Supp. 3d 430, 446 (S.D.N.Y. 2017).  In an RFQ-based system of trading, by contrast, customers request quotes, the quotes are transmitted back to the customers, and the customers then have a set time to execute the trade.  *See id.*  In transmitting quotes to a customer in connection with a potential trade, the SEF must also provide any relevant bids or offers posted in the order book.  *See* 17 C.F.R. § 37.9(a)(3)(i).

To capitalize on Dodd-Frank's reforms, Tera developed TeraExchange – the first SEF that offered *anonymous* CDS trading, utilizing "a central limit order book ('CLOB') allowing for electronic trading among all market participants."  (Am. Compl. ¶ 8.)  Touting itself as the first "all-to-all trading" platform for CDS, TeraExchange showed early promise among market participants.  (*Id.* ¶ 9.)  Nevertheless, Tera alleges that the trading platform never got off the ground as a result of Defendants' collusive efforts to boycott the platform and exclude Tera from the CDS market.  (*Id.* ¶ 17.)

On June 13, 2014, TeraExchange executed the first ever anonymous swap transaction on an "all-to-all CLOB platform."  (*Id.* ¶ 72.)  The trade took place between Chimera Investment Corp. and Mitsubishi UFJ Financial Group, with Chimera's half of the trade cleared by BNP Paribas's clearing division and Mitsubishi UFJ's half of the trade cleared by JP Morgan's clearing division.  (*Id.*)  The next business day, BNP advised TeraExchange that it would not clear any more trades on TeraExchange until it completed a know-your-customer ("KYC") review, which included a review of Tera's Rulebook – a document containing the protocols for how trades are initiated, routed, and executed on the platform.  (*Id.* ¶¶ 59, 73.)  BNP also advised Chimera to "hold off on executing any more trades" until BNP resolved "operational issues."  (*Id.* ¶ 73.)  JP Morgan likewise stopped clearing trades on TeraExchange due to "amorphous technical issues,

including the KYC review and/or an audit of Tera's rulebook."  (*Id.* ¶ 74.)  JP Morgan also prohibited its brokers from using TeraExchange to execute the bank's own trades.  (*Id.*)

In time, other financial institutions also declined to use TeraExchange.  For instance, Citi indicated that it would neither trade nor clear trades on TeraExchange.  (*Id.* ¶ 76.)  Similarly, UBS "confirmed in an internal email that it would not cooperate with TeraExchange."  (*Id.* ¶ 75.)  And after months of negotiations, and repeated requests for revisions to TeraExchange's core documents, UBS ultimately refused to sign TeraExchange's end-user license agreement.  (*Id.* ¶¶ 79–80.)  According to the Amended Complaint, "TeraExchange had a similar experience" with Credit Suisse.  (*Id.* ¶ 80.)  As a result of the purported conspiracy, no further trading occurred on TeraExchange after the first trade on June 13, 2014.  (*Id.* ¶ 127.)

Tera further alleges that Defendants leveraged their control over CDS clearing – in their capacity as owners of ICE Clear, the largest clearinghouse for CDS, and in their roles as the clearing members of ICE Clear and two other major clearinghouses, CME and LCH.Clearnet – to take advantage of Dodd-Frank's central-clearing requirement and freeze out TeraExchange from the market.  (*Id.* ¶¶ 82, 87–88.)  Specifically, Tera contends that Defendants refused to conduct pre-trade credit checks for parties to TeraExchange-based trades.  (*Id.* ¶¶ 84–85.)  Given Dodd-Frank's requirement that customers pass a credit check before trading on an SEF, the alleged boycott effectively "stopped every prospective CDS trade on TeraExchange in its tracks."  (*Id.* ¶ 85.)  Defendants also quoted potential TeraExchange customers "punishingly high [clearing] fees," while offering lower – or no – fees to clear trades on SEFs that permitted RFQ-based trading, such as Tradeweb (an SEF created and owned by Defendants) or Bloomberg.  (*Id.* ¶¶ 82, 93.)  Based on the "barriers" that Defendants put into place, market participants began to "waver in their support for TeraExchange's platform."  (*Id.* ¶ 94.)

Tera alleges that Defendants further undermined TeraExchange by refusing to allow inter-dealer brokers ("IDBs") to trade on it.  (*Id.* ¶ 97.)  IDBs are intermediaries that facilitate financial transactions – including CDS transactions – on behalf of financial institutions.  (*Id.* ¶¶ 68, 98.)  As such, IDBs needed consent from the financial institution before using TeraExchange to execute trades on its behalf.  (*Id.* ¶ 98.)  According to Tera, "all [Defendants] universally refused to give their consent," preventing IDBs from using the platform and forcing one IDB with whom Tera had already signed an agreement to back out of its commitment to use the exchange.  (*Id.* ¶¶ 98–102.)

Tera further alleges that Defendants took various steps to keep the CDS market a "two-tiered trading structure, which benefited [Defendants] while systematically disadvantaging their customers."  (*Id.* ¶¶ 5, 104.)  For starters, Defendants insisted on post-trade name disclosure – sometimes referred to as "name give-up" – by demanding that IDBs use MarkitWIRE, a trade-processing service that offers counterparties a last look at a trade, revealing the parties' identities and offering them an opportunity to terminate the transaction.  (*Id.* ¶¶ 112–14.)  Tera alleges that this practice was unnecessary in the age of centralized clearing and served only to provide Defendants with a "surveillance mechanism" to determine which trading platforms and parties were abiding by their rules and which ones were not.  (*Id.* ¶ 106.)  Given the importance of name give-up in maintaining a bifurcated CDS market structure, Defendants threatened to put "transgressors" – any platform that allowed anonymous trading or any buy-side firm that traded anonymously – in the "penalty box."  (*Id.* ¶¶ 120–21.)  For trading platforms, the "penalty box" meant that Defendants would refuse to trade on the offending platform.  (*Id.* ¶¶ 121–22.)  For buy-side customers, the "penalty box" meant that Defendants would refuse to trade with them in any venue, would withhold key banking services, and would make it difficult for them to trade

other derivative products.  (*Id.* ¶ 123.)  According to Tera, Defendants' threats were widely reported, causing other customers to back out of their agreements with Tera.  (*Id.* ¶¶ 124–26.)

Tera contends that, as a result of Defendants' allegedly anticompetitive conduct, "TeraExchange has been shut out of the CDS market" and "no further trading has occurred on TeraExchange following its launch on June 13, 2014."  (*Id.* ¶ 127.)

## B.  Procedural History

Tera commenced this lawsuit in 2017, asserting four claims against twelve financial institutions for allegedly conspiring to block TeraExchange from "successfully entering the [CDS] market."  (Doc. No. 1 ("Original Complaint" or "Compl.") ¶ 1.)  Over the next two years, the Court dismissed Tera's claims against six financial institutions for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure and/or for failure to state a claim under Rule 12(b)(6) (Doc. Nos. 134, 141), narrowing Tera's claims to two causes of action – one under the federal Sherman Act, 15 U.S.C. § 1, and the other under New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.* – against the six remaining financial institutions.

After discovery in a separate proceeding called into question the veracity of several of the allegations contained in Tera's Original Complaint, Defendants served a Rule 11 notice on Tera and demanded that it withdraw those allegations from its pleading.[5]  (Mem. at 4.)  Tera apparently agreed (Opp'n at 1), and on January 30, 2020, Tera filed an Amended Complaint that omitted the allegations identified by Defendants as false.  Now before the Court is Defendants' joint motion to dismiss, in which Defendants argue that Tera's Amended Complaint has been stripped of the factual allegations that once rendered Tera's claims of conspiracy plausible.  (Mem. at 7.)

---

[5] The above-referenced proceeding is a multi-district litigation pending in the Southern District of New York involving claims of unlawful collusion by banks operating in the market for interest rate swaps.  *See In re IRS*, No. 16-MD-2704 (JPO).

II. LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 570.

III. DISCUSSION

A. Sherman Antitrust Act

Section 1 of the Sherman Antitrust Act prohibits any contract, combination, or conspiracy "in restraint of trade or commerce among the several States." 15 U.S.C. § 1. To plead a section 1 claim, a plaintiff must allege (1) "a combination or some form of concerted action between at least two legally distinct economic entities" (2) "that . . . constituted an unreasonable restraint of trade."

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993). Where, as here, the alleged conduct – a group boycott – is unlawful per se, *see Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959), the only question is "whether the challenged conduct stems from independent decision or from an agreement, tacit or express," *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010) (internal quotation marks and alterations omitted).

An agreement may be established in one of two ways. "First, a plaintiff may, of course, assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws. Such evidence would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (citation omitted). Second, because "this type of 'smoking gun' can be hard to come by, especially at the pleading stage," a plaintiff may instead "present circumstantial facts supporting the *inference* that a conspiracy existed." *Id.* These circumstantial facts may take the form of (1) parallel conduct and (2) certain "plus factors," discussed in greater detail below. *Id.*

Parallel conduct "does not itself constitute a violation of the Sherman Act," because although such conduct is "consistent with conspiracy," it is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Starr*, 592 F.3d at 321 (quoting *Twombly*, 550 U.S. at 553–54). Instead, Tera must place the parallel-conduct allegations "in a context that raises a suggestion of a preceding agreement," as opposed to "independent action." *Twombly*, 550 U.S. at 557. This context can be shown by pleading "plus factors" or other circumstantial evidence that, combined with parallel conduct, "make it plausible to infer an agreement among competitors." *In re IRS*, 261 F. Supp. 3d at

462–63.   The Second Circuit has recognized three non-exclusive plus factors:   "(1) a common motive to conspire; (2) evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators; and (3) evidence of a high level of interfirm communications."   *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (internal quotation marks omitted).   Ultimately, Tera is not required to rule out the possibility of independent action; it need only "put forth sufficient factual matter to plausibly suggest an inference of conspiracy, *even if* the facts are susceptible to an equally likely interpretation."   *Id.* at 782.

Defendants first argue that many of the allegations in the Amended Complaint impermissibly rely on generalizations about Defendants as a group.   (Mem. at 7.)   The law is clear that, when charged with conspiracy, "each defendant is entitled to know how he is alleged to have conspired, with whom[,] and for what purpose."   *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016).   Thus, to survive a motion to dismiss, a complaint must set forth sufficient facts to establish that the defendants, "in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective."   *AD/SAT, a Div. of Skylight Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999); *see also Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 316 (S.D.N.Y. 2018) (explaining that a complaint must allege "a factual connection between each [d]efendant and the alleged conspiracy" (internal quotation marks omitted)).   For this reason, group allegations that fail to name a particular defendant are worthy of "less weight," as they fail to link any one defendant to the alleged conspiracy.   *In re IRS*, 261 F. Supp. 3d at 474.

The Amended Complaint is rife with group-pleading allegations.   Of the sixty-two paragraphs in the Amended Complaint that set forth factual allegations about Defendants' conduct,

only seventeen name a particular Defendant; the other allegations are primarily directed at Defendants as a group, without specifying which Defendant actually engaged in the alleged conduct.[6] (*See* Am. Compl. ¶¶ 73–134.) For instance, Tera alleges that Defendants "refused" to conduct pre-trade credit checks for TeraExchange customers, but the Amended Complaint does not name a single Defendant that did so or describe the particulars of those "refusals." (*Id.* ¶¶ 84–86.) Similarly, Tera does not allege which Defendants made their provision of liquidity conditional on the use of name give-up. (*Id.* ¶¶ 111–18.) Other allegations, meanwhile, describe purportedly anticompetitive conduct by one Defendant, such as Citi's practice of quoting higher clearing fees for TeraExchange-based trades, but fail to state with whom Citi conspired to extend this practice among the various alleged coconspirators. (*Id.* ¶ 93.) What is more, nine paragraphs in the Amended Complaint refer only to the "Dealers," a term Tera has defined to include defendants that have been dismissed from this action.[7] Since group-pleading allegations, like those listed above, deprive defendants of "fair notice of what the claim is and the grounds on which it rests," *In re IRS*, 261 F. Supp. 3d at 478 (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012)), they are of little value.

Turning to the seventeen particularized allegations, the Court finds that Tera alleges parallel conduct at only the most generalized level – namely, that Defendants refused to trade (or allow IDBs to trade) on TeraExchange or clear trades that customers executed on the platform. But because parallel conduct alone is not sufficient to allege a plausible conspiracy, *see Starr*, 592

---

[6] The following paragraphs in the Amended Complaint are the ones that name a particular Defendant: 73, 74, 75, 76, 77, 79, 80, 87, 88, 90, 93, 98, 100, 101, 102, 108, and 121. For purposes of this calculation, the Court did not include the facts set forth in the Amended Complaint's "Introduction," which are appropriately phrased at a higher degree of generality than those alleged in the "Facts" section.

[7] The paragraphs that name only the "Dealers" are 89, 91, 92, 113, 114, 115, 116, 120, and 122. Although one of these paragraphs does not use the term "Dealers," it refers only to HSBC, a bank that the Court has already dismissed from this action and that is not named as a Defendant in the Amended Complaint. (Am. Compl. ¶ 92.)

F.3d at 322, the Court next considers whether the allegations in the Amended Complaint present circumstantial facts establishing the "plus factors" recognized by the Second Circuit to support the inference of a prior agreement.

Here, one plus factor – "a common motive to conspire" – is apparent on the face of the Amended Complaint.  Tera alleges that each Defendant had an economic interest in boycotting TeraExchange and preserving the RFQ-based system of trading.  (Am. Compl. ¶ 12.)  RFQ trading allowed Defendants to earn "supracompetitive profits" by quoting "inflated bid/ask spreads" for CDS transactions.  (*Id.* ¶¶ 6, 12 (internal quotation marks omitted).)  But while the Court agrees that Tera has plausibly alleged that each Defendant had an interest in maintaining the status quo in the CDS market, or at the very least promoting the Tradeweb SEF that Defendants owned, that common motive to not use TeraExchange or clear trades executed on the platform is not enough to support the inference of a prior agreement.  *See Mayor & City Council of Baltimore*, 709 F.3d at 137 (holding that "even if a plaintiff alleges additional facts or circumstances – what we have previously called 'plus factors' – these facts must still lead to an inference of conspiracy").

Put differently, Tera merely alleges that Defendants benefited from the RFQ model of trading, and, as a result, had a common motive to prevent Tera from disrupting the CDS market.  But the fact that TeraExchange was a threat to Defendants' RFQ margins and a potential competitor to the Tradeweb SEF was obvious to all Defendants.  It therefore was consistent with "competitive business strategy" for each of the Defendants to unilaterally avoid dealing with TeraExchange.[8]  *Twombly*, 550 U.S. at 554.  That each elected to do so does not support an inference of collusion or concerted action among them.  *Cf. Anderson News, L.L.C. v. Am. Media,*

---

[8] While the Amended Complaint alleges that Dodd-Frank "put an end to the RFQ-only model" of trading (Am. Compl. ¶ 7), nothing in the text of the statute or its implementing regulations suggests that Defendants' continued use of RFQ-based trading was unlawful.

*Inc.*, 899 F.3d 87, 112 (2d Cir. 2018) (recognizing that the motive to conspire can be negated where a "defendant shows a plausible and justifiable reason for its conduct that is consistent with proper business practice" (internal quotation marks omitted)).  Tera therefore must allege additional facts, circumstances, or plus factors to support a plausible inference of a preceding agreement among the six remaining Defendants.  This it has failed to do.

With respect to the existence "of a high level of interfirm communications," *Gelboim*, 823 F.3d at 781 (internal quotation marks omitted), a comparison of the two complaints reveals that Tera has withdrawn its strongest allegations supporting this plus factor.  For example, Tera no longer alleges that there was a "synchronized response to Tera's first swap trade, which entailed four different Defendants calling Tera 'almost simultaneously' on the first business day following the trade and making near-identical statements that each Defendant would not clear trades on TeraExchange until they completed an 'audit' of the rulebook."  *Tera Grp.*, 2019 WL 3457242, at *18.  As the Court observed when assessing the Original Complaint, the timing of those calls was particularly suggestive of coordination given that news of the first trade had not yet been publicized.  *Id.* at *17.  And while the Amended Complaint still alleges that several Defendants audited Tera's Rulebook, Tera has dropped the part of this allegation that the Court previously found most compelling – namely, that Defendants had never completed those audits.  (*Compare* Compl. ¶ 96, *with* Am. Compl. ¶¶ 73–78.)  This allegation thus no longer gives rise to an inference that Defendants collectively agreed to use the audits as a pretext for locking Tera out of the CDS market.

Tera has also withdrawn its allegation that Defendants separately referred to TeraExchange as a "Trojan Horse," an allegation involving the use of an unusual mythical metaphor that the Court previously viewed as strong evidence of a coordinated plan to exclude Tera from the CDS

market.   (*Compare* Compl. ¶ 126, *with* Am. Compl. ¶ 103.)   To be sure, Tera's Amended

Complaint continues to allege that Defendants "*regarded* TeraExchange's platform as a 'Trojan

Horse.'" (Am. Compl. ¶ 103 (emphasis added).)   But Tera does not allege that any Defendant ever

actually *used* this term to refer to the platform, nor does it offer a basis for its conclusion that

Defendants in fact regarded it as such.  *See Darby v. Greenman*, 14 F.4th 124, 130 n.6 (2d Cir.

2021) ("While we construe pleaded facts in the light most favorable to the plaintiff, we can draw

inferences based only on the facts actually alleged, and we are not free to speculate about

unpleaded facts that might be favorable to the plaintiff.").   This revised allegation thus stands in

stark contrast to the Original Complaint's assertion that multiple Defendants actually employed

the term "Trojan Horse" to describe TeraExchange, which lent credence to Tera's claim that the

Defendants communicated before coordinating their response to Tera's platform.  Stripped of these

factual allegations, the Amended Complaint is largely conclusory as to this plus factor.

Tera's allegations concerning the remaining plus factor – conduct "show[ing] that the

parallel acts were against the apparent individual economic self-interest of the alleged

conspirators," *Gelboim*, 823 F.3d at 781 (internal quotation marks omitted) – fare no better.  When

the Court first considered this plus factor, it determined that it lent "marginal" support for the

proposition that Defendants acted against their economic interests by passing up on fees that could

have been earned from clearing TeraExchange-based trades.  *Tera Grp.*, 2019 WL 3457242, at

*20 (internal quotation marks omitted).  While Tera continues to allege that Defendants left money

on the table by declining to clear TeraExchange-based trades, Tera acknowledges that Defendants

had obvious economic reasons to encourage their customers to use the RFQ-based system of

trading and the Tradeweb platform that they owned.  (Am. Compl. ¶¶ 6, 12.)  More importantly,

Tera has failed to allege that the fees Defendants would have earned from clearing

TeraExchange-based trades exceeded the "large[]" profits they were earning from their own trading platforms and RFQ-based trading more generally. (*Id.* ¶ 6.) Accordingly, the Amended Complaint offers little support for the conclusion that Defendants' refusal to clear trades on TeraExchange was against their own economic self-interest. *See In re IRS*, 261 F. Supp. 3d at 477 (concluding that the plaintiffs' focus on profitability was "myopic," where, as here, the "overarching allegation is that preventing the all-to-all . . . trading platform[] from taking root enriched the [defendants] by preserving their wider spreads and profit margins").

In a last-ditch effort to avoid dismissal, Tera insists that two of its allegations – (1) UBS's and Credit Suisse's contemporaneous refusals to execute Tera's end-user license agreement (Am. Compl. ¶ 80), and (2) "heated phone calls" placed by representatives from Credit Suisse and JP Morgan to an interdealer SEF "over the introduction of trade anonymity for the buy side" (*id.* ¶ 121) – have not changed and are sufficient to support a conspiracy claim against Defendants. But without the since-removed portions of the Amended Complaint, these allegations – considered anew and in context – fail to demonstrate coordination between Defendants. As to Tera's allegation regarding the refusals to sign Tera's end-user license agreement, Tera merely asserts that it "had a similar experience with UBS[]" as it did with Credit Suisse. (*Id.* ¶ 80.) That amounts to nothing more than a narrow assertion of parallel conduct among two of the remaining Defendants. Moreover, Tera says nothing about the particulars or timing of those purportedly "similar experiences." Far from suggesting coordination, the alleged conduct – even when all reasonable inferences are drawn in Tera's favor – is simply an unremarkable instance of parallel conduct that is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Starr*, 592 F.3d at 321 (quoting *Twombly*, 550 U.S. at 553–54). And Tera's allegation that representatives from Credit Suisse and

JP Morgan had "heated phone calls" with an IDB concerning the introduction of trade anonymity offers no details concerning what threats, if any, were made, much less how they support an inference of coordinated conduct by two or more Defendants.  (Am. Compl. ¶ 121.)  Even if Defendants feared "that allowing nonbanks to trade anonymously could hurt their ability as swaps providers" (*id.*), that fact alone does not suggest a conspiracy, since "rational and competitive" actors would independently recognize the impact that anonymous trading could have on their bottom line, *Twombly*, 550 U.S. at 554; *see In re IRS*, 261 F. Supp. 3d at 464 ("It follows that each Dealer had good reason to independently discourage (e.g., in its dealings with IDBs) and not encourage (e.g., in not using a new clearing product) development of a new trading paradigm that threatened, some day, to cannibalize their trading profits.").  While Tera makes much of these two allegations, they fail to give rise to an inference of a prior agreement and thus cannot bear the weight that Tera places on them.

*     *     *

In sum, considering all the allegations in the Amended Complaint, the Court concludes that Tera has failed to plead a plausible section 1 claim.  As such, the motion to dismiss Tera's section 1 claim is GRANTED as to all Defendants.

### B.  Donnelly Act

New York's Donnelly Act tracks the Sherman Act, prohibiting "[e]very contract, agreement, arrangement or combination whereby . . . [c]ompetition . . . may be restrained."  N.Y. Gen. Bus. Law § 340(1).  Indeed, the Donnelly Act was "modelled on" its federal equivalent. *X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518 (1994).  The New York Court of Appeals has thus explained that the Donnelly Act "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory

language[,] or the legislative history justify such a result." *Id.* (internal quotation marks omitted); *see also Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012) ("The standard for a well-pleaded Donnelly Act claim is the same as a claim under Section 1 of the Sherman Act.").  Because the merits of Tera's Donnelly Act claim track the merits of Tera's section 1 claim, the motion to dismiss Tera's Donnelly Act claim is GRANTED as to all Defendants.

## IV. CONCLUSION

From the beginning, Tera has maintained that Defendants conspired to lock it out of the lucrative market for CDS.  When the Court first considered Tera's claims, Tera's complaint included allegations that rendered the inference of a prior agreement plausible.  But Tera has since walked back the most significant of those allegations, leaving a complaint that teems with conclusory allegations pleaded against Defendants as a group but little more.  The handful of allegations that do manage to identify a specific Defendant presume a conspiracy based on parallel conduct.  But that conduct – without more – is not enough to support an inference of concerted action or a preceding agreement among Defendants.  Accordingly, Tera has failed to state a claim against Defendants, and the Amended Complaint must therefore be dismissed.

For the foregoing reasons, Defendants' motion to dismiss Tera's Sherman Act claim and Donnelly Act claim is GRANTED and the Amended Complaint is DISMISSED with prejudice as to all Defendants.  The Clerk of Court is respectfully directed to terminate the motion pending at Doc. No. 173 and to close this case.

SO ORDERED.

Dated:        August 14, 2023
              New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation